EISMANN, Chief Justice.
This is an appeal from: (a) an order denying a motion to amend the complaint to assert a claim of negligent eredentialing against a hospital; (b) an order refusing to order discovery of certain medical records provided by a physician to the board of medicine; and (c) the granting of summary judgment in favor of an emergency room physi *647 cian. We reverse the order of the district court holding that Idaho Code § 39-1392e grants immunity from a claim for negligent credentialing. We decline to decide the issue of whether certain medical records provided to the board of medicine were privileged because the appellant did not name the physician claiming that privilege as a respondent to this appeal. We affirm the grant of summary judgment in favor of the emergency room physician. Finally, we decline to award the emergency room physician attorney fees on appeal.
I. FACTS AND PROCEDURAL HISTORY
On November 14, 2003, at about 11:35 p.m., H. Ray Harrison arrived at the emergency room (ER) of Saint Alphonsus Regional Medical Center (Hospital). His symptoms included nausea, vomiting, diarrhea, imbalance, and speech impediment. According to his family, Harrison’s condition had been deteriorating over the preceding seven weeks, with episodes of vomiting and diarrhea occurring three or four times a day. Julie Anderson, his significant other whom he later married, reported that for the prior three days he had not consumed anything other than alcoholic beverages. A nurse drew blood from Harrison for necessary chemistry panels, including a basic metabolic panel of blood tests called a Chem 7.
Dr. Binnion was working in the ER that night. At about 1:00 a.m. she began her assessment of Harrison. About forty minutes later, she received lab results from the Chem 7 showing that Harrison’s blood sodium level was 96 milliequivalents per liter (mEq/L), a low level of sodium that was life-threatening. The lab results also showed that Harrison’s blood alcohol content was 0.13. Dr. Binnion ordered that Harrison be given an intravenous (IV) saline solution at the rate of 200 cc’s per hour. The saline IV was started at 1:50 a.m. and was replaced at 2:20 a.m.
Dr. Binnion could not admit Harrison into the hospital. At about 2:25 a.m. she telephoned Dr. Hartford, who was the on-call physician for Harrison’s treating physician. Dr. Hartford agreed to admit Harrison into the hospital. Dr. Binnion suggested that Harrison be admitted to the telemetry unit, but Dr. Hartford thought that it would be too stimulating in light of Harrison’s alcohol abuse and that he should be admitted to the medical floor. Dr. Binnion wrote the admission orders for Dr. Hartford. Those orders included that Harrison be given IV sodium at 200 cc’s per hour and that Harrison have blood draws every six hours for a Chem 7 test. Apparently because of the lack of available beds in the medical unit, Harrison was admitted to the orthopedic unit at 3:26 a.m. At that point, Dr. Binnion was no longer responsible for Harrison’s care.
Dr. Hartford first saw Harrison at 11:17 a.m. on November 15, 2003. By that time, results of the second Chem 7 test done at 6:00 a.m. showed a sodium level of 105 mEq/L. After reviewing the medical records and examining Harrison, Dr. Hartford wrote his treatment plan. It included IV sodium at 200 cc’s per hour and a Chem 7 test done every six hours.
Dr. Hartford continued the saline IV until 10:00 a.m. on November 17, 2003. During that period, Harrison’s sodium levels continued to increase to 110 mEq/L at 12:27 p.m. on November 15, 2003; to 114 mEq/L at 5:58 p.m. on November 15, 2003; to 124 mEq/L at 3:57 a.m. on November 16, 2003; and to 126 mEq/L at 10:10 a.m. on November 16, 2003.
Harrison’s condition continued to deteriorate under Dr. Hartford’s care. On November 22, 2003, another physician diagnosed Harrison as suffering from central pontine myelinolysis (CPM), a condition in which the myelin sheath covering brainstem nerve cells is destroyed which prevents nerve signals being transmitted properly. CPM is caused by a too rapid change in sodium levels in the body. Harrison contends that his CPM was caused by his sodium level rising too rapidly.
On April 28, 2004, Harrison and Anderson (Plaintiffs) filed this action against Drs. Hartford and Binnion and the Hospital alleging that they were negligent in their treatment of Harrison and that they also committed the torts of negligent and intentional infliction of emotional distress. On November 15, 2005, Plaintiffs filed a motion to *648 amend their complaint to allege that the Hospital was negligent in credentialing Dr. Hartford. After the motion was briefed and argued, the district court denied the motion to amend. It held that there was no cause of action in Idaho for negligent credentialing because Idaho Code § 39-1392e granted the Hospital immunity from such a claim.
During the litigation, the Plaintiffs served interrogatories and requests for production upon Dr. Hartford seeking information regarding any substance abuse treatment he had received and whether he had been disciplined by the Idaho Board of Medicine. Dr. Hartford objected to this discovery, and on May 26, 2005, the Plaintiffs filed a motion to compel discovery. The district court held that under Idaho Rule of Evidence 503, Dr. Hartford had a privilege to refuse to disclose communications made for the purpose of diagnosis or treatment of alcohol or drug addiction and that Dr. Hartford had not waived that privilege by disclosing the information to the Idaho Board of Medicine. The court also held that under Idaho Code § 39-308, the fact of whether Dr. Hartford had obtained treatment through a certified substance abuse treatment program was also privileged. The court therefore denied the motion to compel to the extent that it sought discovery of such privileged information.
The Plaintiffs then sought to obtain from the Idaho Board of Medicine documents that had been entered as exhibits during an administrative disciplinary hearing regarding Dr. Hartford. On April 3, 2006, Dr. Hartford filed a motion for a protective order seeking to prevent disclosure of those documents to the extent that they consist of records relating to substance abuse treatment. He also sought redaction of any references to substance abuse treatment in letters from his former attorney to the Board of Medicine. The district court granted that motion.
The Plaintiffs ultimately settled their claims against Dr. Hartford. Pursuant to stipulation, on August 29, 2006, the district court entered an order dismissing with prejudice the Plaintiffs’ claims against Dr. Hartford.
On April 27, 2007, Dr. Binnion moved for summary judgment on the grounds that the Plaintiffs’ expert did not show that he was familiar with the applicable standard of care and there was no evidence that any alleged negligence by Dr. Binnion was a proximate cause of any harm to Harrison. After briefing and argument, the district court granted the motion on the ground that there was no evidence of causation with respect to the alleged negligence of Dr. Binnion. The district court also held that the Plaintiffs’ expert had not familiarized himself with the applicable standard of care. On Plaintiffs’ motion for rehearing, the court modified its order granting summary judgment by reserving until trial any ruling on whether Plaintiffs’ expert had adequately familiarized himself with the applicable standard of care.
Pursuant to stipulation, on September 18, 2007, the district court entered an order dismissing Plaintiffs’ remaining claims against the Hospital. Harrison then timely appealed.
II. ISSUES ON APPEAL
1. Did the district court err in holding that Idaho Code § 39-1392c granted the Hospital immunity from a claim of negligent credentialing?
2. Did the district court err in holding that Dr. Hartford did not waive any privilege when he presented documents regarding his substance abuse treatment to the Idaho Board of Medicine in connection with a disciplinary hearing?
3. Did the district court err in granting Dr. Binnion’s motion for summary judgment on the issue of causation?
4. Is Dr. Binnion entitled to an award of attorney fees on appeal pursuant to Idaho Code § 12-121?
III. ANALYSIS
A. Did the District Court Err in Holding that Idaho Code § 39-1392c Granted the Hospital Immunity from a Claim of Negligent Credentialing?
The Plaintiffs sought to amend their complaint to add a claim against the Hospital *649 for negligent credentialing in granting hospital privileges to Dr. Hartford. The district court held that such claim was barred by Idaho Code § 39-1392C.[1] The applicable portion of that statute provides, “The furnishing of information or provision of opinions to any health care organization or the receiving and use of such information and opinions shall not subject any health care organization or other person to any liability or action for money damages or other legal or equitable relief.” The information furnished and opinions provided are to be used by the health care organization “in conducting peer review,” id., which includes “[c]redentialing, privileging or affiliating of health care providers as members of, or providers for, a health care organization,” I.C. § 39-1392a(11)(a). The district court reasoned that if a health care organization has immunity for using information and opinions when making a credentialing decision, then it must also have immunity for the credentialing decision ultimately made. In so holding, the district court erred.
“The interpretation of a statute is a question of law over which we exercise free review.” State v. Thompson, 140 Idaho 796, 798, 102 P.3d 1115, 1117 (2004). “It must begin with the literal words of the statute; those words must be given their plain, usual, and ordinary meaning; and the statute must be construed as a whole. If the statute is not ambiguous, this Court does not construe it, but simply follows the law as written.” McLean v. Maverik Country Stores, Inc., 142 Idaho 810, 813, 135 P.3d 756, 759 (2006). (Citations omitted.)
There is nothing in the wording of the statute that purports to grant immunity to a health care organization for making a eredentialing decision. The statute grants immunity for “[t]he furnishing of information or provision of opinions to any health care organization” and for “the receiving and use of such information and opinions.” The obvious purpose of the statute is to encourage the free exchange of information and opinions regarding peer review activities, which includes credentialing. A person who provides such information or opinions need not fear a subsequent lawsuit alleging claims such as slander, defamation, tortious interference with contract or prospective economic advantage, or intentional infliction of emotional distress. The statute grants immunity from “liability or action for money damages or other legal or equitable relief.” I.C. § 39-1392c. (Emphasis added.) The broad grant of immunity may also form a basis for the recovery of attorney fees under Idaho Code § 12-121 and/or Idaho Rule of Civil Procedure 11(a)(1). The health care organization that receives or relies upon such information or opinions is likewise immune from any claim or action for damages or other legal or equitable relief for doing so.
The district court held that immunity for using the information or opinions must also include immunity for the decision ultimately made. Had the legislature so intended, it would have drafted the statute to provide for such immunity. Although the gathering and consideration of information are preliminary steps in making a decision, they are separate from the making of the decision. This is illustrated by the fact that it is common for experts to arrive at conflicting opinions after considering the same information. Holding that Idaho Code § 39-1392c grants immunity for credentialing decisions would be an expansion of that statute beyond its wording. The district court therefore erred in holding that the statute granted such immunity.
*650 B. Did the district court err in holding that Dr. Hartford did not waive any privilege when he presented documents regarding his substance abuse treatment to the Idaho Board of Medicine in connection with a disciplinary hearing?
Dr. Hartford objected to the disclosure of records relating to his substance abuse treatment that he provided to the Idaho Board of Medicine. He claimed that such records were privileged pursuant to Idaho Rule of Evidence 503(b)(1). That Rule provides:
A patient has a privilege in a civil action to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of diagnosis or treatment of the patient’s physical, mental or emotional condition, including alcohol or drug addiction, among the patient, the patient’s physician or psychotherapist, and persons who are participating in the diagnosis or treatment under the direction of the physician or psychotherapist, including members of the patient’s family.
The district court held that such records were privileged under Rule 503(b)(1) and that Dr. Hartford had not waived that privilege by disclosing the information to the Idaho Board of Medicine. Relying upon Idaho Rule of Evidence 510,[2] Harrison contends that the district court erred in holding that Dr. Hartford had not waived the physician privilege provided by Rule 503(b)(1).
Harrison did not name Dr. Hartford as a respondent in the notice of appeal. The notice of appeal was directed to: “THE ABOVE NAMED RESPONDENTS, D. LEE BINNION, M.D. AND SAINT AL-PHONSUS REGIONAL MEDICAL CENTER, INC.” We long ago held, “Where a notice of appeal is addressed to certain parties, naming them, its legal effect is limited to such parties only.” Williams v. Sherman, 34 Idaho 63, 66, 199 P. 646, 647 (1921). During oral argument, counsel for Harrison stated that a copy of the notice of appeal was mailed to Dr. Hartford’s counsel. The certificate of service on the notice of appeal does not so indicate. Even if a copy of the notice of appeal was mailed to Dr. Hartford’s counsel, we held in Mahaffey v. Pattee, 46 Idaho 16, 18, 266 P. 430, 431 (1928), “Where a notice of appeal is directed to one party alone, its service upon another party would not have the effect of bringing such other party before the court.”
Dr. Hartford is the one who would have a privilege to prevent the disclosure of confidential communications in his medical records. Because Harrison did not name Dr. Hartford as a respondent, he is not a party to the appeal. This Court cannot decide his rights without him having an opportunity to be heard. Therefore, Harrison has failed to perfect an appeal regarding the issue of whether the district court was correct in holding that Dr. Hartford had not waived his physician privilege. We will not consider that issue.
C. Did the District Court Err in Granting Dr. Binnion’s Motion for Summary Judgment on the Issue of Causation?
In an appeal from an order of summary judgment, this Court’s standard of review is the same as the standard used by the trial court in ruling on a motion for summary judgment. Infanger v. City of Salmon, 137 Idaho 45, 44 P.3d 1100 (2002). All disputed facts are to be construed liberally in favor of the non-moving party, and all reasonable inferences that can be drawn from the record are to be drawn in favor of the non-moving party. Id. Summary judgment is appropriate if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Id. If the evidence reveals no disputed issues of material fact, then only a question of law *651 remains, over which this Court exercises free review. Id.
In this case, expert testimony of causation is required. In Swallow v. Emergency Medicine of Idaho, P.A. 138 Idaho 589, 597-98, 67 P.3d 68, 76-77 (2003), we held that expert testimony is required unless it is a matter within the usual and ordinary experience of a lay person. We stated as follows:
We have previously held that a lay person was not qualified to give an opinion about the cause of a medical condition or disease. Bloching v. Albertson’s, Inc., 129 Idaho 844, 934 P.2d 17 (1997) (lay person was not qualified to testify that the seizure he suffered immediately after using a blend of pork and beef insulin was caused by the insulin); Evans v. Twin Falls County, 118 Idaho 210, 796 P.2d 87 (1990) (husband was not qualified to testify that conduct by sheriffs deputies on April 15, 1987, in grabbing and shaking his wife was a cause of her cardiac arrest and death over eleven months later); Flowerdew v. Warner, 90 Idaho 164, 409 P.2d 110 (1965) (patient was not qualified to testify that his injury was caused by physician’s treatment). In support of the holding in Evans v. Twin Falls County, we quoted from 31A Am.Jur.2d, Expert & Opinion Evidence § 207 as follows:
Where the subject matter regarding the cause of disease, injury, or death of a person is wholly scientific or so far removed from the usual and ordinary experience of the average person that expert knowledge is essential to the formation of an intelligent opinion, only an expert can competently give opinion evidence as to the cause of death, disease or physical condition.
118 Idaho at 214, 796 P.2d at 91.
Whether a rise in sodium levels in a specified amount over a specified period of time would cause CPM in Harrison is not a matter within the usual and ordinary experience of lay people. Likewise, whether the conduct of Dr. Binnion could be a cause of Harrison’s CPM is likewise not a matter within the usual and ordinary experience of lay people. Therefore, Harrison was required to produce expert testimony that Dr. Binnion’s conduct was a proximate cause of Harrison’s CPM.
Dr. Binnion was Harrison’s treating physician from 1:00 a.m. to 3:26 a.m. on November 15, 2003, while he was in the emergency room. During that time, she ordered that he be given an IV saline solution to raise his sodium level. She also called Dr. Hartford to arrange for Harrison to be admitted into the Hospital and wrote the physician’s orders for Dr. Hartford so that he would not have to come to the Hospital that night.
The only expert testimony that Dr. Binnion’s conduct was a cause of any harm to Harrison came from his expert witness Dr. Navar. He testified that Dr. Binnion’s alleged malpractice was: (1) her failure to communicate to Dr. Hartford the seriousness of Harrison’s condition; (2) her failure to include in her orders appropriate instructions to the nurses that they immediately tell the treating physician, Dr. Hartford, all of Harrison’s laboratory sodium values; and (3) her failure to admit Harrison to ICU.[3] He also *652 testified that in his opinion each of these instances of negligence was a cause of Harrison’s CPM.
Proximate cause contains two components: actual cause, which is a factual question of whether a person’s conduct produced a particular harm, and legal cause, which is a legal question of whether legal liability attaches to the conduct. Newberry v. Martens, 142 Idaho 284, 288, 127 P.3d 187, 191 (2005). Where an expert testifies regarding the factual basis for his or her opinion regarding causation, we will examine those facts to see if they support the opinion. Each of Dr. Navar’s allegations of negligence by Dr. Binnion will be discussed separately.
1. Dr. Binnion’s alleged failure to communicate to Dr. Hartford the seriousness of Harrison’s condition. Dr. Binnion first saw Harrison at about 1:00 a.m. on November 15, 2003. At about 2:25 a.m., she telephoned Dr. Hartford, who was the on-call physician for Harrison’s treating physician. Dr. Hartford agreed to admit Harrison into the hospital, but Dr. Hartford did not come into the hospital to see Harrison until about 11:00 a.m. Dr. Navar thought that if Dr. Binnion had given Dr. Hartford more information when they talked on the telephone, then Dr. Hartford would have seen Harrison sooner than 11:00 a.m.[4] For Dr. Binnion to be liable for this alleged negligence, there must be expert testimony supporting a conclusion that Dr. Hartford’s failure to see Harrison prior to 11:00 a.m. was a cause of Harrison’s CPM.
Dr. Binnion was responsible for Harrison’s care from 1:00 a.m. to 3:26 a.m. on November 15, 2003. During that period, she ordered that Harrison be given IV sodium at the rate of 200 ee’s per hour, which was started at 1:50 a.m. She also wrote the physician orders for Dr. Hartford that were in effect from 3:26 a.m. until 11:00 a.m. when Dr. Hartford saw Harrison in the Hospital.[5] Those physician orders also directed that Harrison be given IV sodium at the rate of 200 cc’s per hour.
Harrison’s first lab results on November 15, 2003, showed a sodium level of 96 mEq/L at 12:49 a.m., a life threateningly low level of sodium. After reviewing those lab results at 1:00 a.m., Dr. Binnion began sodium replacement by ordering that Harrison have a saline IV at the rate of 200 cc’s per hour. The second lab results at 6:00 a.m. showed that Harrison’s sodium level had increased to 105 mEq/L. According to Dr. Navar, at that point the rate of sodium replacement should have been slowed significantly or stopped. Dr. Hartford did not become aware of the 6:00 a.m. lab results until he examined Harrison at 11:00 a.m. Thus, there was evidence supporting Dr. Binnion’s liability if that five-hour delay in Dr. Hartford learning of the 6:00 a.m. lab results was a cause of any harm to Harrison. There was no factual basis for concluding that it was.
First, after Dr. Hartford examined Harrison and reviewed the medical records showing the 9 mEq/L increase in Harrison’s sodium levels from 12:49 a.m. to 6:00 a.m., Dr. Hartford decided to give Harrison IV saline at 200 ec’s per hour. He testified that in his opinion he could not slow the rate of sodium replacement because of Harrison’s vomiting, dehydration, and hypokalemia. In fact, Dr. Hartford did not alter the rate of sodium *653 replacement until 10:00 a.m. on November 16, 2003, when he stopped the saline IV. There is no evidence that Dr. Hartford would have done anything different had he come into the hospital and seen Harrison earlier.
Second, assuming that Dr. Hartford would have altered the rate of sodium replacement had he been at the hospital at 6:00 a.m. rather than at 11:00 a.m., there was no evidence that the failure to alter the rate of sodium replacement between 6:00 a.m. and 11:00 a.m. was a cause of any harm to Harrison. During the period from 12:49 a.m. to 12:27 p.m., Harrison’s sodium level increased from 96 mEq/L to 110 mEq/L, an increase of 14 mEq/L during a twelve-hour period. Although that rate of increase would support a finding of negligence, in order for Dr. Binnion to be liable there must also be evidence that her negligence was a proximate cause of harm to Harrison. He did not produce any expert testimony supporting a finding that it was.
Dr. Navar testified that he did not know whether the 14 mEq/L increase in Harrison’s sodium level during that initial 12-hour period was a cause of harm to Harrison. Dr. Navar’s deposition testimony on this issue was as follows:
A I don’t know whether that initial increase from 96 to 110 over a 12-hour period would have been enough to result in the insult just by itself.
Q And that was 14 milliequivalents in approximately a 12-hour period of time?
A Right.
Q Okay. How about the 9 milliequivalent increase in the approximate six-hour period of time from 0049 to 6 a.m., would that in and of itself have been enough to cause CPM in Mr. Harrison?
AI don’t know.
Dr. Binnion started Harrison’s sodium replacement when he was in the ER. Once Harrison was admitted into the Hospital, Dr. Binnion no longer had any responsibility for his care. Dr. Hartford became Harrison’s treating physician. It was his obligation to monitor the change in Harrison’s sodium levels and to adjust the rate of sodium replacement accordingly. This is not a situation in which Dr. Binnion began a negligent course of treatment that continued because Dr. Hartford negligently failed to detect it. Dr. Navar twice testified that he had no criticism of Dr. Binnion for ordering the saline IV’s that Harrison received in the ER.
Dr. Binnion also wrote the initial physician’s orders for Dr. Hartford, and those orders remained in effect until he wrote his own after examining Harrison at 11:00 a.m. In those initial physician’s orders, Dr. Binnion wrote that Harrison was to be given IV sodium at the rate of 200 cc’s per hour. There was no testimony, however, that she was negligent for doing so.
There was one statement by Dr. Navar that could be interpreted as being critical of Dr. Binnion’s treatment while Harrison was in the ER. After testifying that he was not critical of Dr. Binnion for ordering the TV saline in the ER to begin sodium replacement, Dr. Navar stated that Dr. Binnion should have slowed the rate of administration significantly after receiving the lab test results showing a sodium level of 96 mEq/L. His testimony was as follows:
A But at the time that the sodium value became available again, at that point, I would think that the sodium level or the rate of administration of fluid would need to be closely monitored from that standpoint. It probably should have been slowed down significantly from the time that it was — and I guess that’s not listed in this opinion.
Q When did you form that opinion, that the rate of administration should have been slowed down?
A I’ve had that opinion from the beginning.
Q When should the administration of normal saline have been slowed down?
A When Dr. Binnion got the lab report back that the sodium level was 96.
It is obvious that Dr. Navar misspoke when stating that Dr. Binnion should have slowed the rate of sodium replacement after receiving the lab results showing a sodium level of 96 mEq/L. Dr. Navar began by saying that “at the time that the sodium value became available again.” (Emphasis added.) *654 The use of the word “again” indicates that he thought there had been a prior lab test showing an earlier sodium level. There had not been. The 96 mEq/L sodium level was from the first lab test. It was the results of the second lab that showed an increase in Harrison’s sodium level. Dr. Navar also stated that when the lab report showing the 96 mEq/L sodium level was received, the rate of administration of fluid should have been “slowed down significantly.” (Emphasis added.) At the time Dr. Binnion saw the lab results showing a sodium level of 96 mEq/L, the saline infusion had not even been started. She did not order the saline IV until after receiving those lab results. It is apparent that Dr. Navar misspoke and was referring to the second lab results that showed an increase in Harrison’s sodium level to 105 mEq/L. Both before and after making the statement quoted above, Dr. Navar testified that he was not critical of Dr. Binnion for the saline IVs she ordered while Harrison was in the ER.[6]
Even accepting Dr. Navar’s testimony at face value that Dr. Binnion should have slowed the rate of saline replacement that she had not yet begun after what were the first lab results were again available, there was no testimony that her failure to do so was a cause of any harm to Harrison. As pointed out above, Harrison did not produce any expert testimony stating that the rate of sodium replacement during the first twelve hours was a cause of any harm to him. He also did not produce any expert testimony stating that the increase in Harrison’s sodium level during the first twelve hour period combined with the subsequent increases while under Dr. Hartford’s care caused Harrison’s CPM.
There is no evidence supporting Dr. Na-var’s opinion that Dr. Binnion’s alleged negligence in failing to give Dr. Hartford more details so he would come to the hospital sooner than he did was a cause of any harm to Harrison. The district court did not err in dismissing this claim of alleged negligence.
2. Dr. Binnion’s failure to include in her orders appropriate instructions to the nurses that they immediately tell Dr. Hartford all of Harrison’s laboratory sodium values. Dr. Navar also testified that in his opinion Dr. Binnion was negligent for failing to include in the physician’s orders a direction to the nurses to immediately tell Dr. Hartford of Harrison’s laboratory sodium values and that such negligence was a cause of Harrison’s CPM. The physician’s orders written by Dr. Binnion were in effect from 3:26 a.m. until 11:00 a.m., when Dr. Hartford examined Harrison and wrote his own physician’s orders. The only lab results received during that period of time were those obtained at 6:00 a.m. Had Dr. Binnion done as Dr. Navar suggests, Dr. Hartford would have learned of those lab results at around 6:00 a.m. rather than at 11:00 a.m. For the reasons stated above regarding the alleged negligence in not making Dr. Hartford aware of the need to come into the hospital as soon as possible to see Harrison, there is no evidence that Dr. Hartford’s failure to learn of the 6:00 a.m. lab results earlier was a cause of any harm to Harrison. Thus, there is no evidence supporting Dr. Navar’s opinion that Dr. Binnion’s failure to order the nurses to immediately advise Dr. *655 Hartford of the lab results was a cause of any harm to Harrison. The district court did not err in dismissing this claim of alleged negligence.
3. Dr. Binnion’s failure to admit Harrison to the ICU. Dr. Navar testified that Dr. Binnion was negligent for not admitting Harrison to the ICU, where he would have had blood draws more frequently than every six hours to more closely monitor his sodium levels. It is uncontradicted that Dr. Binnion did not have authority either to admit Harrison to the Hospital or to decide whether he would be admitted to ICU rather than to some other part of the Hospital. Where Dr. Binnion did not have any authority to admit Harrison to the Hospital, her alleged failure to admit him to the ICU in the Hospital cannot legally be a proximate cause of his CPM. She cannot be held liable for failing to do something she had no authority to do. The district court did not err in dismissing this claim of alleged negligence.
D. Is Dr. Binnion Entitled to an Award of Attorney Fees on Appeal Pursuant to Idaho Code § 12-121?
Dr. Binnion seeks an award of attorney fees under Idaho Code § 12-121. That statute authorizes an award of attorney fees on appeal to Dr. Binnion, as the prevailing party, if Harrison brought or pursued the appeal frivolously, unreasonably, or without foundation. Nampa & Meridian Irr. Dist. v. Mussell, 139 Idaho 28, 37, 72 P.3d 868, 877 (2003). We do not find that Harrison brought or pursued the appeal against Dr. Binnion frivolously, unreasonably, or without foundation. We therefore decline to award attorney fees under Idaho Code § 12-121.
IV. CONCLUSION
We vacate the judgment dismissing this action as to the Saint Alphonsus Regional Medical Center, Inc., (Hospital) and remand this case for further proceedings consistent with this opinion. We award Harrison costs on appeal against the Hospital. We affirm the judgment dismissing this action against Dr. Binnion and award her costs on appeal against Harrison,
Justices BURDICK and J. JONES concur.

. The statute states as follows:
The furnishing of information or provision of opinions to any health care organization or the receiving and use of such information and opinions shall not subject any health care organization or other person to any liability or action for money damages or other legal or equitable relief. Custodians of such records and persons becoming aware of such data and opinions shall not disclose the same except as authorized by rules adopted by the board of medicine or as otherwise authorized by law. Any health care organization may receive such disclosures, subject to an obligation to preserve the confidential privileged character thereof and subject further to the requirement that such requests shall be made and such use shall be limited to aid the health care organization in conducting peer review.

. Idaho Rule of Evidence 510 provides:
A person upon whom these rules confer a privilege against disclosure of the confidential matter or communication waives the privilege if the person or the person’s predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter or communication. This rule does not apply if the disclosure is itself a privileged communication.

. Dr. Navar testified during his deposition as follows:
Q It says: "Mr. Rossman, I'm comfortable with the following statements. Please contact me if you have any questions.”
“Number one, Mr. Harrison visited the ER department with, among other diagnoses, a condition of profound chronic hyponatremia.
"Number two, Dr. Binnion breached the local standard of care by failing to fully and completely communicate Mr. Harrison’s history, physical exam, symptoms and test results to Dr. Hartford prior to the admission of Mr. Harrison to the orthopedic floor of the hospital.
“Number three, Dr. Binnion breached the local standard of care by failing to communicate within her physician's orders at the time they were written, her concerns about rapid elevation of sodium, and that all laboratory sodium values be immediately communicated to the attending physician upon receipt by attending nursing staff.
"Number four, Dr. Binnion breached the prevailing local standard of care by admitting Mr. Harrison to the orthopedic floor of the hospital rather than the ICU.
"Number 5, Dr. Binnion’s breach of the prevailing local standard of care as identified above was a substantial factor in causing the condition of Central Pontine Myelinolysis in Mr. Harrison."
MS. OLSSON: You can read it from the exhibit.
*652 MR. ROSSMAN: Central Pontine Myelinolysis.
BY MS. OLSSON:
Q Are those your opinions, Doctor?
A They are.
Q Do you have any other opinions in this case?
A No.

. Dr. Navar testified in his deposition:
THE WITNESS: One of my criticisms is that it’s my opinion that Dr. Binnion did not give a full — did not reveal the acuity of the situation in her deposition. I couldn’t find that she actually gave Dr. Hartford the actual sodium results.
She did mention he had hyponatremia, and my concern would be that Dr. Hartford, you know, not being present to see Mr. Harrison, may not have been aware of the acuity of the situation and the necessity for him to report to the hospital for Mr. Harrison’s evaluation right away.

. The record does not reflect whether Dr. Hartford dictated what Dr. Binnion was to write for his physician orders or whether she used her own discretion. We therefore assume she used her own discretion in writing the orders for Dr. Hartford.

. Before testifying that the rate of administration of fluid should have been slowed down significantly when the lab results were again available showing a sodium level of 96 mEq/L, Dr. Navar testified as follows:
Q Okay. Do you have criticism, Doctor, of Dr. Binnion’s treatment, actual treatment of the sodium replacement for Mr. Harrison while he was in the emergency department at St. Alphonsus Hospital?
A No, I don’t specifically. I — Dr. Binnion was not aware of the sodium level until sometime in the latter portion of his visit, so I don't have a specific criticism regarding the fact that he was given some fluid boluses in the emergency department.
After testifying that the rate of saline replacement should have been slowed after receipt of the lab results showing a sodium level of 96 mEq/L, Dr. Navar testified as follows:
Q Okay. So you have no criticism of the normal saline boluses; right?
A No.
A “bolus” is "a: a dose of a substance (as a drug) given intravenously b: a large dose of a substance given by injection for the purpose of rapidly achieving the needed therapeutic concentration in the bloodstream.” Merriam-Webster Online Dictionary (visited March 23, 2009) <http://www.merriam-webster.com/dictionary/ bolus >