# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 36801

| | | |
|---|---|---|
| JAMES M. PHILLIPS and GALE PHILLIPS, | ) ) ) | Boise, May 2011 Term |
| Plaintiffs-Respondents, | ) ) | 2011 Opinion No. 54 |
| v. | ) ) | Filed: May 25, 2011 |
| MILT E. ERHART and MARY C. ERHART, | ) ) | Stephen W. Kenyon, Clerk |
| Defendants-Appellants. | ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, in and for Ada County. The Hon. Richard D. Greenwood, District Judge.

The judgment of the district court is affirmed.

Paul V. Esposito, Clausen Miller P.C., Chicago, Illinois, argued for appellants.

Kurt D. Holzer, Holzer Edwards, Chtd., Boise, argued for respondents.

_____

EISMANN, Chief Justice.

This is an appeal from a judgment against landlords awarding damages resulting from injuries suffered from falling down a flight of stairs in the leased premises. The issues raised are whether there was sufficient evidence to support the jury's finding of causation and of willful or reckless conduct by a defendant and whether the district court abused its discretion in failing to grant a new trial on the issue of damages for loss of consortium. We affirm the judgment of the district court.

## I. FACTS AND PROCEDURAL HISTORY

Milt and Mary Erhart are the owners of a commercial building in Meridian, Idaho, containing offices that they rent to various lessees. The building had external stairs consisting of carpet-covered, wooden steps from ground level to a landing and then from the landing to the second floor. There was a second-story cover over the stairs, but they were open to the elements

on three sides.  In October 2003, Mr. Erhart decided that the wooden steps and carpeting had deteriorated to the point that they constituted a hazard.

He talked with a salesman from a construction company, who suggested that he replace the wooden steps with preformed concrete treads.  Mr. Erhart purchased the treads, and then over a weekend he and another man removed the existing steps and installed the concrete ones.

Installing the treads required attaching right angle brackets to the parallel wooden stringers and then attaching treads to the brackets.  The length of each bracket was a few inches shorter than the width of the treads.  Each bracket had two holes for attaching them to the stringers with lag bolts and two elongated holes for attaching the treads to the brackets using lag bolts screwed up into the bottoms of the treads.

Mr. Erhart and his assistant began installing the treads at ground level.  The first flight had ten steps.  When installing the eighth tread from the bottom (third from the top), Mr. Erhart discovered that the stringers were too far apart for the elongated holes on the top side of the installed brackets to align with the holes in the bottom of the tread.  He decided simply to bolt the tread to the bracket on the right side (facing the stairs from the bottom) and to leave the opposite side of the tread just resting on the left-side bracket.  He encountered the same problem with the next step up (second from the top), and did the same thing.

When asked whether he could have used washers as shims between the brackets and stringers to move the brackets closer together, he answered that he did not think that would have worked because as he recalls the distance necessary was about an eighth of an inch.  When asked whether there was any problem using washers as spacers, he responded that they could have been used temporarily, but he did not think they would be stable long term.  He testified that there were no washers on any of the brackets of the stairs.  When shown a picture of a bracket in the upper flight of stairs with three washers used as a spacer, he stated that he had used the washers on one end of that bracket, but he did not believe he could have used three washers on the two treads in the lower flight of stairs.  When asked whether he could have obtained a wooden shim, he answered that he could not have done so and finished the job that day.  He did not consult with anyone to determine whether leaving one side of the treads unattached to a bracket would pose a hazard, and he did not attempt to shim the brackets so that he could attach both sides of the treads.  There is no evidence that he had any expertise to know whether attaching only one side of the treads could create a hazard.

2

Jim Phillips had an office on the second floor of the Erharts' building. He weighed about 320 pounds. On March 20, 2006, he was walking down the stairs carrying a cardboard box with trash in it, and he fell while walking down the lower flight of steps. He was found lying face down on the concrete landing at the bottom of the stairs. He was taken by ambulance to the emergency room and released that day. He suffered various injuries including a closed head injury that caused permanent brain damage and a loss of memory.

The Phillipses filed this action on April 25, 2007, to recover damages resulting from his fall. The case was tried to a jury in April 2009, and the jury returned a verdict awarding Mr. Phillips $546,174 in economic damages and $562,000 in noneconomic damages and awarding Mrs. Phillips $556,200 in noneconomic damages for loss of consortium. The jury also found that Mr. Erhart was solely at fault for the accident and that his actions were willful or reckless.

The Erharts filed motions for a judgment notwithstanding the verdict, for a new trial, and for a remittitur. After a hearing, the district court denied the motions for a judgment n.o.v. and a new trial. It granted a remittitur, ordering a new trial unless the Phillipses accepted a reduction in economic damages to $253,014.49. The Phillipses accepted that reduction, and the court entered a judgment accordingly. The Erharts then timely appealed.

## II. ISSUES ON APPEAL

A. Was there sufficient evidence that Mr. Erhart's wrongful conduct was an actual cause of the fall?

B. Was there sufficient evidence that Mr. Erhart's conduct was willful and wanton misconduct?

C. Did the district court abuse its discretion in failing to grant a new trial with respect to Mrs. Phillips's damages for loss of consortium?

## III. ANALYSIS

**A. Was there Sufficient Evidence that Mr. Erhart's Wrongful Conduct Was an Actual Cause of the Fall?**

"Proximate cause contains two components: actual cause, which is a factual question of whether a person's conduct produced a particular harm, and legal cause, which is a legal question of whether legal liability attaches to the conduct." *Harrison v. Binnion*, 147 Idaho 645, 652, 214 P.3d 631, 638 (2009). "Actual cause is the factual question of whether a particular

3

event produced a particular consequence." *Newberry v. Martens*, 142 Idaho 284, 288, 127 P.3d 187, 191 (2005). "This Court will not overturn a jury verdict on proximate cause unless unsupported by substantial and competent evidence." *McKim v. Horner*, 143 Idaho 568, 572, 149 P.3d 843, 847 (2006). In cases questioning the sufficiency of the evidence, "the record must be reviewed to determine whether there is competent evidence to sustain the verdict; and if the litigant's case is one based on circumstantial evidence, whether such circumstantial evidence and reasonable inferences to be derived from the circumstantial evidence sustain the verdict." *Henderson v. Cominco American, Inc.*, 95 Idaho 690, 696, 518 P.2d 873, 879 (1973). "Conflicts in the evidence and conflicts in the conclusions to be reached from the evidence remain questions for the trier of facts." *Id*. However, the verdict cannot rest upon conjecture. *Id*.

There were no witnesses to the accident, and by the time of the trial Mr. Phillips could not recall how the accident happened. He testified that he remembered walking down the stairs with some trash and then smelling concrete.

In February or March, 2006, a tenant in the Erharts' building reported to Mr. Erhart that a tread in the lower flight of stairs was loose. The tenant testified: "The tread actually moved back and forth on the supports that were holding it. It wasn't anchored to the side, so that if you pushed on it, it actually would slide backwards." He said that when he stepped on the stair, it jiggled, and that when he tried moving it, it moved more than a couple of inches. He also opined that if one were carrying something heavy, it would move more easily than if one was using only his or her body weight. Although Mr. Phillips was not carrying something heavy when he fell, his body weight was about 320 pounds. The tenant described the loose tread as being just up from the bottom, but later said he did not know exactly which step it was. Under the evidence, it could only have been one of the two treads that Mr. Erhart improperly installed because those are the only ones that would have been able to move as the tenant described.

When Mrs. Phillips learned of the accident, she called Mr. Phillips's father. He and Mr. Phillips's mother went to the hospital, and when the medical personnel stated that they were going to have an MRI done which would take about an hour, Mr. Phillips's father went to the scene of the accident. He met one of Mr. Phillips's coworkers in the parking lot, and they investigated the scene of the accident. They noticed that one tread in the lower flight of stairs was out of place, and took a picture of it. It was the third tread from the top. The photo shows

4

that the right side of the tread (when standing on top looking down) had moved backwards a few inches. They also discovered that there were no bolts holding that tread to the bracket.

The coworker then discovered that the upper end of the handrail for the lower flight of stairs was not attached to the baluster. The handrail had a groove the length of its underside that fit over the baluster. She lifted up the end of the handrail and saw that there were no screw or nail holes in the handrail, indicating that the upper end had never been attached to the baluster. The handrail was only attached at its lower end. She then walked under the stairs and saw that the head of one of two bolts holding the right angle bracket to the stringer had broken off.

The Phillipses called a mechanical engineer as an expert witness. He testified that the treads that were not bolted down on both sides were deficient in structural integrity and that the handrail was too wide, making it more difficult to grip. Both were violations of the building code. Not having one side of the tread bolted down overloaded the other side because when force was applied to the unattached side, the tread acted as a lever, increasing the force on the side that was bolted down. That force created tension pulling on the lag bolts holding the bracket to the stringer, which was not the type of force they were designed to resist. They were designed to resist shear force. Over time, those lag bolts would loosen.

The Phillipses called an expert in human factors engineering to testify. He examined the stairs in January 2008. He identified several safety defects in the stairway and stated that in his opinion it was unreasonably dangerous. The defects included the failure to attach the two treads to the brackets on the right-hand side (if going down the stairs) and the failure to attach the upper end of the handrail. He stated that the failure to attach one side of the tread caused increased stress on the lag bolts holding the bracket to the stringer on the other side as people walked up and down the stairs. In addition, the people walking on the stairs impact the treads with greater force than their body weight. He said that ultimately, the lag bolts would work their way out of the wood or their heads would shear off. When that happens, the tread will be able to move. He showed that that had occurred on the second and third treads from the top. The head of the forward lag bolt on one bracket had sheared off and the forward lag bolt on the other had been pulled out and was missing.

Mr. Phillips's medical records, which were admitted into evidence, contained two descriptions of the accident. A record dated March 23, 2006, of his initial medical appointment following the accident included a question asking how the injury occurred. Mrs. Phillips wrote

5

on the form, "walking down stairs, step moved, guard rail moved and fell." During his first visit to his physiatrist on April 10, 2006, the physiatrist asked him how the accident happened. She recorded his response as follows: "He was descending a cement staircase and remembers the first two-three steps. He felt like the 'rug was pulled out from under him' and he fell forward tumbling to the ground." The physiatrist put the words "rug was pulled out from under him" in quotes because Mr. Phillips used that simile when telling her what had happened.

From the above evidence, the jury could reasonably have concluded that Mr. Phillips fell because of defects in the stairs and handrail caused by Mr. Erhart. For example, in *Stephens v. Stearns*, 106 Idaho 249, 678 P.2d 41 (1984), the plaintiff was attempting to walk down an interior stairway in her apartment when she fell down the stairs. The stairway did not have a handrail, in violation of the building code. She testified that she reached the top of the stairway and either slipped or fell forward. She then "grabbed" in order to catch herself, but was unable to do so and fell to the bottom of the stairs. The trial court granted the defendants a directed verdict on the ground that the plaintiff failed to show that the absence of the handrail was causally related to her injury. On appeal we reversed, stating: "[W]e do not believe that the jury would have had to rely on conjecture and speculation to find that the absence of the handrail was the actual cause. To the contrary, we believe that reasonable jurors could have drawn legitimate inferences from the evidence presented to determine the issue." *Id*. at 253, 678 P.2d at 45.

The Erharts argue on appeal that the above-quoted statements contained in Mr. Phillips's medical records are inadmissible hearsay and therefore cannot be considered as evidence supporting causation. Because the evidence was admitted without objection, the jury could consider it.

"Objections to evidence cannot be raised for the first time on appeal." *Slack v. Kelleher*, 140 Idaho 916, 922, 104 P.3d 958, 964 (2004). There must be a timely objection to the evidence, *State v. Higgins*, 122 Idaho 590, 596-97, 836 P.2d 536, 543-43 (1992); I.R.E. 103(a)(1), or a motion to strike, which is essentially a delayed objection, *State v. O'Bryan*, 96 Idaho 548, 556, 531 P.2d 1193, 1201 (1975). "The general rule is that where hearsay evidence is admitted without objection, it may properly be considered in determining the facts; the important question being the weight to be given such evidence." *Gem-Valley Ranches, Inc. v. Small*, 90 Idaho 354, 371, 411 P.2d 943, 953 (1966). The majority view is that hearsay evidence admitted without

objection "is as strong as any other legally competent evidence."  29A Am. Jur. 2d *Evidence* § 1367 (2008).

At the beginning of the trial, the two medical records were admitted into evidence by agreement of the parties.  Neither party requested a limiting instruction or that the statements be excised from the records.  The physiatrist later testified without objection to what Mr. Phillips told her about how the accident happened, and the statement written by Mrs. Phillips was later read to her without objection, and she admitted writing it.  Although the Erharts contend that they objected to that portion of Mrs. Phillips's testimony, the record shows that they did not.  The exchange was as follows:

> [MR. HOLZER].  And this is Exhibit 26.  This is dated 3/23 of '06.  This is the first medical record after you get out of the emergency room?
> A.  Yeah.
> Q.  Under date of injury –
> A.  Yeah.
> Q.  there's some handwriting?
> A.  Yeah.
> Q.  Are you familiar with that handwriting?
> A.  Well, it's mine.
> Q.  And it says, "Walking down stairs"—it asks, actually:  "Briefly describe how the injury occurred and what body part was affected."  It says: "Walking down stairs, step moved, guardrail moved and fell.  Legs, eyes, head, neck, face, back, elbows.  A lot of bumps and bruises."  And you wrote that?
> A.  Yes.
> Q.  Were you providing the doctor the most accurate information you knew to provide him?
> A.  Absolutely.
> Q.  Where it says, "walking down stairs, step moved, guardrail moved," where did you first learn that the step moved and the guardrail moved?
> MR. CANTRILL:  Your Honor, I—
> THE COURT: Go ahead.
> MR. CANTRILL: I'm making an objection, obviously.  And we've gone through this so many times, I can't believe counsel has the effrontery to do this.  That's a speaking objection.  I'll ask it be removed.  I do make an objection.  It calls for inadmissible hearsay.
> THE COURT:  And I'm going to sustain the objection.
> MR. HOLZER: Okay.
> THE COURT:  In fairness to counsel, I had reserved ruling on this particular issue, Mr. Cantrill.
> MR. CANTRILL:  Thank you.
> Q.  (BY MR. HOLZER) Do you believe that to be accurate?
> A.  Absolutely.
> Q.  Based on everything you knew?

A. Based on everything.

There was no objection to Mr. Holzer reading from the exhibit; there was no objection to the question asking Mrs. Phillips if she wrote what he read; there was no objection to the question asking if she was providing the doctor with the most accurate information she knew; and there was no objection to the question asking if she believed the statement to be accurate. The only objection was to the question, "[W]here did you first learn that the step moved and the guardrail moved?" The district court sustained that objection.

The Erharts also argue that the district court "reaffirmed its exclusion of the hearsay evidence" from Mrs. Phillips, based upon statements the court made in denying their motion for a judgment notwithstanding the verdict. In its written decision, the court stated:

> The Court agrees with Defendant that Mrs. Phillips' comments, as recorded in the medical records, are not pertinent. The motion in limine intended to preclude her statement regarding Mr. Phillips' utterance from being entered into evidence. Voluminous records medical records were entered into evidence. The particular entry that Plaintiff refers to was not brought to the Court's attention. Had it not been mentioned in Plaintiffs brief, the Court would not be aware of it now. Further, the statement was not mentioned in closing. The medical records and other documents were stipulated into evidence in bulk. The documents were largely ignored from that point of trial on, other than the portions the medical witnesses referred. In any event, Mrs. Phillips was not a witness to the fall and her "knowledge" could only be speculation based on this record.

What the district court would have done had there been an objection to Mrs. Phillips's statement in the medical record and the court's opinion as to the weight of that statement are irrelevant. There was no objection to statements in the medical record, and the court cannot weigh the evidence when ruling on a motion for judgment notwithstanding the verdict, *Weinstein v. Prudential Property and Casualty Ins. Co.*, 149 Idaho 299, 327, 233 P.3d 1221, 1249 (2010).

In their motion in limine, the Erharts sought an order instructing the Phillipses "[t]o refrain from presenting the inadmissible hearsay in the form of alleged statements made by Mr. Phillips to Mrs. Phillips immediately following the accident." In their written response, the Phillipses stated, "In the emergency room, Mr. Phillips told Mrs. Phillips the step moved, he grabbed the rail, and he fell." The motion was argued on the morning of the first day of trial. During that argument, the Phillipses asserted that the statement was admissible as an excited utterance. The district court reserved ruling on the motion, stating, "The excited utterance

8

exception, like I said, I think is pushing the envelope, but will hear the circumstances leading up to the statement before I make a ruling on that."

Because the court reserved ruling on the motion in limine, the Erharts had to object when the evidence was presented. *Karlson v. Harris*, 140 Idaho 561, 565, 97 P.3d 428, 432 (2004). The medical record containing the statement written by Mrs. Phillips was admitted into evidence by agreement of the parties on the first day of trial. The Erharts only objected to the question asking Mrs. Phillips where she first learned that the step moved and the guardrail moved, and that objection was sustained. The Erharts did not object to Mrs. Phillips's written statement in the medical record, or to the reading of that statement, or to the question of whether Mrs. Phillips wrote the statement, or to whether she was providing the doctor with the most accurate information she knew, or to whether she believed her written statement to be accurate based upon everything she knew. Because there was no objection to this evidence, the jury was entitled to consider it with all of the other evidence. *Gem-Valley Ranches, Inc. v. Small*, 90 Idaho 354, 371, 411 P.2d 943, 953 (1966); 29A Am. Jur. 2d *Evidence* § 1367 (2008). On appeal, we will not substitute our opinion for that of the jury with respect to the credibility of witnesses or the weight to be given to, and inferences to be drawn from, the evidence. *State v. Severson*, 147 Idaho 694, 712, 215 P.3d 414, 432 (2009). The evidence admitted during the trial was sufficient to support the jury's verdict on liability.

## B. Was there Sufficient Evidence that Mr. Erhart's Conduct Was Willful and Wanton Misconduct?

Idaho Code § 6-1603(1) places a limit on noneconomic damages. That limit does not apply to "[c]auses of action arising out of willful or reckless misconduct." I.C. § 6-1603(4)(a). The jury found that the actions of Mr. Erhart which were a proximate cause of Mr. Phillips's injuries were willful or reckless. On appeal, the Erharts contend that there was not sufficient evidence to show that Mr. Erhart's wrongful conduct was willful and wanton. They assert, "There is no evidence that Erhart was consciously indifferent to a high probability of harm."

With respect to what constitutes willful or reckless misconduct, the jury was instructed as follows:

> The words "willful or reckless misconduct" when used in these instructions and when applied to the allegations in this case, mean more than ordinary negligence. The words mean intentional or reckless actions, taken under

9

circumstances where the actor knew or should have known that the actions not only created an unreasonable risk of harm to another, but involved a high degree of probability that such harm would actually result.

There is no contention that this instruction is erroneous, so we will address the issue in light of it.[1]

The instruction did not require the jury to find that Mr. Erhart subjectively knew of the high probability of harm. It would be sufficient if he "should have known" that his actions created a high probability that harm would actually result. From the evidence, the jury could reasonably have concluded as follows. Mr. Erhart knew he had an obligation to provide a safe building. He intentionally failed to install the two treads in the manner they were designed to be installed in order to save time. He knew that if the improperly installed treads caused someone to fall, that person could fall about five feet down concrete treads onto a cement slab and be seriously injured. He used three washers as shims on one bolt in the upper flight of stairs, but did not try to use washers as shims to properly install the two treads on the lower flight. He sought to justify that failure by stating that he thinks he would have needed to move the brackets about one-eighth of an inch closer together and he did not think three washers would have done the job. He also stated that he was not sure if four washers (e.g., two on each side) would have moved the brackets close enough together, but he did not try because he would not consider that to be stable long-term. However, he was not concerned whether attaching only one side of the treads would be stable in the long term. He could have obtained wooden shims to put behind the brackets so that he could attach both sides of the treads, but he chose not to do so in order to finish the job on the weekend. At any time during the next two and one-half years, he could have obtained shims and properly installed the treads, but chose not to do so. Mr. Erhart understood he lacked the expertise to know whether failing to bolt down both ends of the treads would be safe, but he never called the company who recommended the treads, or another expert, to determine whether attaching only one side would be safe. He likewise did not examine the bolts to see if failing to properly install the treads was causing any problem. He never went back during the two and one-half years to check the bolts, even though he could easily have done so

---

[1] Because the issue is not raised on appeal, we express no opinion as to whether "willful" means "willful and wanton," nor need we address the difference, if any, between willful and reckless.

simply by walking under the lower flight of stairs and looking up. Had he done so, he could easily have seen that the head had sheared off the front lag bolt attaching one bracket to the stringer and the front lag bolt of another bracket had pulled out, which would permit those treads to move. Had he bothered to check the bolts, he would have seen that only the lag bolts on the two treads he had installed improperly were being subjected to too much stress, indicating that the failure to attach those treads at both ends was a structural and safety problem. About two months before the accident, another tenant told Mr. Erhart that one of the treads in the lower section of stairs moved a couple of inches, but Mr. Erhart did not examine his work to see if there was a problem with the improperly installed treads. He also did not check the handrail to see if he had installed it properly. At any time during the following two and one-half years, simply grabbing it and pulling up would have shown that it was only attached on the bottom end. He did not do so. The jury reasonably could have concluded that Mr. Erhart should have known that his failure to properly install the two treads and the handrail created an unreasonable risk of harm to another and involved a high degree of probability that such harm would actually result. Indifference does not insulate him from a finding that he should have known his actions not only created an unreasonable risk of harm to another, but involved a high degree of probability that such harm would actually result. The jury's finding that Mr. Erhart's actions were willful or reckless is supported by substantial evidence.

## C. Did the District Court Err in Failing to Grant a New Trial with Respect to Mrs. Phillips's Damages for Loss of Consortium?

The jury awarded Mrs. Phillips $556,200 in noneconomic damages for loss of consortium. The Erharts moved for a new trial on the ground of excessive damages that appeared to have been given under the influence of passion or prejudice. I.R.C.P. 59(a)(5). The district court denied the motion, and the Erharts contend it abused its discretion in doing so. "When ruling on a motion premised upon inadequate or excessive damages, the trial court compares the jury's award to what the court would have given, based upon its weighing of the evidence." *Weinstein v. Prudential Property and Casualty Ins. Co.*, 149 Idaho 299, 326, 233 P.3d 1221, 1248 (2010). "Unless the disparity is so great that it appears to the trial court that the award was given under the influence of passion or prejudice, the award must stand." *Id.* "This Court has been consistent in recognizing the district court's important function in passing on

motions for new trial, and upholding the district court's grant or denial of such a motion, unless the district court has manifestly abused the wide discretion vested in it." *Johannsen v. Utterbeck*, 146 Idaho 423, 430, 196 P.3d 341, 348 (2008).

When ruling on the Erharts' motion for a new trial, the district court stated:

> The Court has not calculated a precise number for each element of damage it would have awarded, but the Court does not find the amounts awarded by the jury in this case to be so disparate from the rough numbers it would have awarded so as to show the jury was operating under the influence of passion or prejudice.

The Erharts contend that the district court abused its discretion because it applied the wrong standard in denying the motion for a new trial. They assert: "The court applied an incorrect legal standard. Defendants were not required to 'show' that the jury was actually influenced by passion and prejudice. The mere appearance of passion and prejudice is sufficient." The Erharts have not shown that the district court applied the wrong standard.

In its opinion, the court stated, "Rule 59(a)(5) is applicable when damages are so excessive or inadequate as to appear to be the result of partiality by the jury. If the trial judge believes that the jury's award may only be explained as resulting from passion or prejudice, then he should grant a new trial under 59(a)(5)." It is the disparity between the jury's award and the amount the court would have awarded that indicates the jury's award was given under the influence of passion or prejudice. Here, the district court did not hold that the Erharts had failed to prove that there was in fact passion or prejudice. It found that there was not the required disparity between the jury's award and what the court would have awarded. The court did not apply the wrong standard in ruling on the motion.

The Erharts also assert that the Phillipses introduced evidence concerning factors that were not relevant to the loss of consortium and that the jury must have considered those factors in making its award. The district court instructed the jury, " 'Loss of consortium' means the loss of the aid, care, comfort, society, companionship, services, protection and conjugal affection of an injured spouse." The Erharts have not challenged that jury instruction, and "[w]e must presume that the jury followed the jury instructions in arriving at their verdict," *Weinstein v. Prudential Property and Casualty Ins. Co.*, 149 Idaho 299, 335, 233 P.3d 1221, 1257 (2010). There is no indication the jury in this case failed to do so.

12

The Erharts argue that Mrs. Phillips's award is a greater percentage of her spouse's award than a list of other Idaho cases. Damages for loss of consortium are not limited to a particular percentage of the damages awarded to the spouse. Each case must be decided on its facts.

Finally, the Erharts challenge the award to Mrs. Phillips by arguing that her damages "paled in comparison to the [sic] her husband's damages." In support of that argument, they summarize Mr. Phillips's injuries and resulting impairments as follows:

> Phillips came to the emergency room with a closed head injury that caused a loss of consciousness, contusions on a leg, abrasions on his face and/or neck, a torn right rotator cuff ultimately requiring surgery, a disc problem, a broken jaw, and a broken tooth. He was agitated, anxious, and intermittently confused and forgetful. Phillips received large doses of morphine for his severe pain. Phillips suffered a traumatic brain injury and post-concussive syndrome, including problems with forgetfulness, decreased short-term memory, blurred vision, difficulty with light exposure, problems with sleeping, balance, dizziness, nausea, hot flashes, taste changes, trouble focusing and spelling, and personality changes. He would become emotional and irritable. Phillips suffered mild cognitive deficits and depression and a little PTSD. He was treated by a battery of physicians and therapists. He has been permanently placed on at least four medications. He has developed a nervous eye tick. At the time of trial, Phillips was still very nervous, anxious, and fidgety. Improvements notwithstanding, Philips suffered permanent disabilities from the accident.
>
> Lay witnesses testified about Phillips' condition. Work supervisor George Schendler stated that Phillips had significant memory issues requiring him to take notes and that he physically shook at work. Co-worker Ron Sundberg testified to Phillips' problems with memory and organization. Co-worker Angela Sisco testified that Phillips was no longer a funny, gregarious, and outgoing person. Phillips' performance ratings fell below expectations.
>
> Phillips became afraid of the water and could no longer dive for abalone, an activity he had enjoyed since his youth. He was uncomfortable driving his own boat, he would get easily disoriented on hunting trips and lost if left. He would get very frustrated and cry over mistakes. [Citations to the record omitted.]

Virtually all of the long-term consequences of Mr. Phillips's injuries listed by the Erharts would also result in Mrs. Phillips losing "aid, care, comfort, society, companionship, services, protection and conjugal affection" of Mr. Phillips. The jury was instructed that a male of Mr. Phillips's age has a life expectancy of 42.7 years. Considering Mr. Phillips's life expectancy and the impact his permanent injuries will have on his relationship with Mrs. Phillips, the jury award to her does not indicate it was given under the influence of passion or prejudice.

13

"This Court has been consistent in recognizing the district court's important function in passing on motions for new trial, and upholding the district court's grant or denial of such a motion, unless the district court has manifestly abused the wide discretion vested in it." *Johannsen v. Utterbeck*, 146 Idaho 423, 430, 196 P.3d 341, 348 (2008). The district court did not abuse its discretion in denying the motion for new trial on the damages awarded to Mrs. Phillips.

## IV. CONCLUSION

We affirm the judgment of the district court. We award costs on appeal to respondents.

Justices BURDICK, J. JONES, W. JONES, and J. Pro Tem KIDWELL **CONCUR**.