IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket No. 41286

DENNIS RAY HENNEFER and MARYANN )
HENNEFER, individually, and as the parents )
of AUSTIN HENNEFER, deceased, )
                                           )
    Plaintiffs-Respondents-Cross Appellants, )
                                           )
v. )
                                           )
BLAINE COUNTY SCHOOL DISTRICT )
#61, )
                                           )
    Defendant-Appellant-Cross )
    Respondent, )
                                           )
and )
                                           )
SERGIO LOPEZ-RODRIGUEZ, )
                                           )
    Defendant. )
_____ )

Boise, January 2015 Term

2015 Opinion No. 33

Filed: March 30, 2015

Stephen W. Kenyon, Clerk

Appeal from the District Court of the Fifth Judicial District of the State of Idaho, Blaine County. Hon. Robert J. Elgee, District Judge.

The judgment and post-trial orders of the district court are <u>affirmed</u>.

Anderson, Julian & Hull LLP, Boise, and Powers Tolman Farley, PLLC, Boise, for appellant. Brian K. Julian argued.

Jeffrey J. Hepworth, P.A. & Associates, Twin Falls, for respondents. Jeffrey J. Hepworth argued.

_____

J. JONES, Justice

    The appellant, Blaine County School District #61 (School), appeals from a jury verdict and post-trial orders favoring the respondents, Dennis and Maryann Hennefer, the parents of Austin Hennefer, who died in a T-bone type automobile accident while performing a three-point turnabout at the instruction of Jeffrey Mecham, a School driver training instructor. The jury returned a special verdict, finding Austin's death resulted from Mecham's reckless conduct. It

1

found Mecham 100% responsible for the death and the School, Mecham's employer, liable for non-economic damages totaling $3.5 million. The School timely appealed.

**I.**
**FACTUAL AND PROCEDURAL BACKGROUND**

Austin Hennefer died in a motor vehicle accident on October 26, 2010, on Highway 20 in Blaine County. At the time, Austin was in a Driver's Education vehicle under the supervision of a School driver training instructor, Jeffrey Mecham. Another student, Jennifer Mares, was also a passenger in the vehicle. Prior to this accident, Austin had regularly driven a motorcycle, four-wheeler, and/or small pickup to help feed cattle on his family's farm. However, Austin had logged only 3.33 hours of driving on highways with an instructor.

The day of the accident, Austin and Mares were scheduled to begin their drive at 7:00 a.m. As their parents drove each student into Carey, there was snow on the ground and the roads were slick. Austin was to be the first driver of the morning and was to drive west from Carey on Highway 20, a 65 mph highway. Mares testified that as they left the school to begin the drive, the roads looked slick and it was foggy and cloudy. She said the roads stayed about the same throughout the drive. All witnesses who were present at the scene of the accident testified that the roads were slick, though their specific descriptions of the conditions varied.

The general consensus among the witnesses was that the lighting conditions were very poor due to the time of day. The testimony varied on how much traffic was present around the time of the accident. Heading west from Carey, Highway 20 eventually intersects with Highway 75, and the Driver's Education vehicle reached this intersection roughly thirty minutes into the drive. Mecham instructed Austin to proceed through the intersection on Highway 20 and they would shortly turn around and switch drivers.

Shortly after the Driver's Education vehicle passed the intersection, Mecham instructed Austin to pull to the side of the road, perform a three-point turnabout, and switch drivers. Though she had her eyes closed at the time, Mares testified she could feel Austin begin the first stage of the three-point turn by turning left across both lanes of the highway. She then felt him perform the second stage of the three-point turn by reversing back across the lanes. She opened her eyes again when Austin was shifting gears into Drive to go into the final stage of the three-point turn. When she opened her eyes, she looked out her window from the back seat on the driver's side of the vehicle and saw the headlights of Lopez-Rodriguez' car coming straight

2

toward them, approximately forty feet away. At the speed Lopez-Rodriguez was estimated to be traveling, it would have taken less than one second for Lopez-Rodriguez' car to drive the remaining forty feet before colliding with the Driver's Education vehicle.

Lopez-Rodriguez' account of the accident was taken in a police statement and introduced at trial through Officer Ornelas. Lopez-Rodriguez believed the Driver's Education vehicle was parked on the side of the road when he first saw it and then pulled out right in front of him at the last second. Contrary to Lopez-Rodriguez' perception of the circumstances, the majority of the evidence at trial showed the Driver's Education vehicle was in the middle or final stages of the three-point turn when Lopez-Rodriguez first saw it. The Hennefers called Joellen Gill, a human-factors expert, to explain why Lopez-Rodriguez may have thought he saw the Driver's Education vehicle to the side of the road and then pulling out in front of him.

The fall semester when the accident occurred was the first and only time Mecham taught Driver's Education, having become certified the summer preceding the accident. It appears that the snow on the day of the accident was the first snow of the fall, so Mecham had never had the opportunity to teach driving in snowy conditions before the day of the accident. The course to become certified in teaching Driver's Education was taught by Brian Johns, who testified at trial. Johns testified he teaches that three-point turns are inherently hazardous and should be used rarely. Mecham admits he was taught and understood this information on three-point turns.

Following the accident, Hennefers filed a wrongful death action against the School, Mecham, and Lopez-Rodriguez, though the claim against Mecham was later dropped.[1] The Hennefers did not pursue a case theory that involved Lopez-Rodriguez' negligence.[2]

Both the School and the Hennefers called accident reconstructionists to testify about the accident. Each reconstructionist had conducted test three-point turns to determine approximately how long such a maneuver takes, and they agreed the turnabout may have taken someone of Austin's experience level twenty-five seconds or more under the conditions.

At trial, the Hennefers proceeded under a theory that Mecham's conduct in causing the accident was "reckless," which would allow them to exceed the cap on non-economic damages in Idaho Code section 6-1603. The jury returned a special verdict, finding Mecham 100%

---

[1] Mecham was dismissed as an individual defendant because the School admitted Mecham was acting in the course and scope of his employment at the time of the accident.

[2] Lopez-Rodriguez remained a named defendant and was represented at trial because, as a defense, the School attempted to prove that Lopez-Rodriguez was negligent in his conduct surrounding the accident.

responsible for causing the accident and that his conduct in doing so was reckless. To Austin's father, the jury awarded approximately $7,500 in economic damages and $1.5 million in non-economic damages. To Austin's mother, the jury awarded $2 million in non-economic damages. The School thereafter moved for judgment notwithstanding the verdict (JNOV) and for a new trial. Hennefers moved for attorney fees. All three motions were denied. The School appealed and the Hennefers cross-appealed.

## II.
## ISSUES ON APPEAL

1.    Whether the School is entitled to judgment as a matter of law that Mecham did not act recklessly in causing the accident.

2.    Whether the district court erred in instructing the jury.

3.    Whether the district court erred in refusing to grant the School's motion for a new trial.

4.    Whether the district court erred by allowing Joellen Gill to testify.

5.    Whether the district court erred in denying the Hennefers' claim for attorney fees.

6.    Whether the Hennefers are entitled to attorney fees on appeal.

## III.
## DISCUSSION

**A.    The School is not entitled to judgment as a matter of law on the issue of Mecham's recklessness.**

Idaho Code section 6-1603 imposes a $250,000[3] maximum limit on non-economic damages in tort actions seeking damages for personal injury or death. I.C. § 6-1603(1) & (2). However, this limitation on non-economic damages does not apply in cases where the cause of action arises "out of willful or reckless misconduct." I.C. § 6-1603(4)(a). This statute does not define "willful or reckless misconduct." *See* I.C. §§ 6-1601, 6-1603; *Kuntz v. Lamar Corp.*, 385 F.3d 1177, 1186 (9th Cir. 2004). The jury in this case returned a verdict far exceeding the statutory cap on damages. It also found that Mecham acted recklessly, meaning the cap does not apply. The School argues that throughout this case the district court employed an incorrect standard of "recklessness" under applicable Idaho law and that, had the correct standard been used, the School would have been entitled to judgment as a matter of law that Mecham did not

---

[3] This cap is adjusted annually according to the percentage of Idaho Industrial Commission adjustments to the average annual wage, computed pursuant to Idaho Code section 72-409(2). I.C. § 6-1603(1).

act recklessly. The issues then become whether the trial court erred in the standard of recklessness it applied to the School's various motions and whether the School is entitled to judgment as a matter of law.

1. **Appropriate standard of "recklessness."**

With respect to the standard of recklessness that should apply under Idaho Code section 6-1603, the School argues that the correct standard involves an analysis of only the actor's subjective knowledge of a risk, subjective knowledge of the high probability that harm will result from that risk, and a conscious decision to proceed with the course of action despite that risk. The Hennefers argue a more objective test applies. We agree with the Hennefers.

Idaho Pattern Civil Jury Instruction 2.25 provides the definition of "willful and wanton," and the comment to this instruction provides that "[t]here appears to be no distinction between 'reckless' and 'willful and wanton.'" The instruction says:

> The words "willful and wanton" . . . mean more than ordinary negligence. The words mean intentional or reckless actions, taken under circumstances where the actor knew or should have known that the actions not only created an unreasonable risk of harm to another, but involved a high degree of probability that such harm would actually result.

IDJI 2.25. In *Carrillo v. Boise Tire Co.*, where an instruction on the definition of recklessness was given that was substantively identical to IDJI 2.25, this Court discussed the definition of "willful or reckless misconduct" as it is used in Idaho Code section 6-1603. 152 Idaho 741, 751, 274 P.3d 1256, 1266 (2012). There, the Court affirmed the trial court's determination that "reckless or willful misconduct is simply a degree of negligence . . . that involves both intentional conduct and knowledge of a substantial risk of harm." *Id.* Though at first glance the Court's use of the words "intentional" and "knowledge" might indicate a purely subjective standard for recklessness, we showed there is an objective element to the recklessness standard when we elaborated on the differences between recklessness and ordinary negligence. We said:

> Reckless misconduct . . . differs from that form of negligence which consists in mere inadvertence, incompetence, unskillfulness or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency in that reckless misconduct requires a conscious choice of a course of action *either* with knowledge of the serious danger to others involved in it <u>or</u> with *knowledge of facts which would disclose this danger to any reasonable man*.

*Id.* (quoting *State v. Papse*, 83 Idaho 358, 362, 362 P.2d 1083, 1086 (1961)) (emphasis added). A "serious danger" in the passage above "involves a risk substantially greater in amount than that

which is necessary to make [the] conduct negligent." *Id.*

In *Phillips v. Erhart*, we interpreted the meaning of language in an instruction essentially identical to IDJI 2.25.[4] 151 Idaho 100, 107, 254 P.3d 1, 8 (2011). There, the defendant argued there was insufficient evidence to prove recklessness because "[t]here [was] no evidence that [he] was consciously indifferent to a high probability of harm." *Id.* We stated that the wording of this instruction does "not require the jury to find that [defendant] subjectively knew of the high probability of harm. It would be sufficient if he 'should have known' that his actions created a high probability that harm would actually result." *Id.* Finally, though not directly in the context of Idaho Code section 6-1603, this Court has upheld the use of IDJI 2.25 in the past. *Hall v. Farmers Alliance Mut. Ins.*, 145 Idaho 313, 325, 179 P.3d 276, 288 (2008); *O'Guin v. Bingham Cnty.*, 139 Idaho 9, 14, 72 P.3d 849, 854 (2003) (citing with approval the prior version of this pattern instruction that is the same in substance though worded differently).

*Phillips*, *Carrillo*, and IDJI 2.25 show that an objective, "should-have-known" standard is the appropriate standard of recklessness under Idaho Code section 6-1603. Though the actor must make a conscious choice as to his or her course of action, the actor need not subjectively be actually aware of the risk or the high probability that harm will result. It is sufficient for a finding of recklessness that the actor makes the choice as to his or her course of conduct under circumstances where the risk and high probability of harm are objectively foreseeable. Although the School cites several cases and statutes that apply a more subjective standard for recklessness, none of these sources directly address the use of the term "reckless" within the context of Idaho Code section 6-1603. Therefore, we find no reason to deviate from the directly applicable authority supporting the more objective approach.

### 2. Motions for judgment as a matter of law.

#### a. The School is not entitled to judgment as a matter of law on its appeal of the district court's denial of the School's motion for summary judgment.

The School moved for partial summary judgment on the issue of whether Mecham acted recklessly or willfully. The district court ruled from the bench, denying the motion. Although the School appeals that decision, Idaho strictly adheres to the rule precluding appellate review of a district court's denial of summary judgment where the case has gone through to the finder of

---

[4] Although we did not expressly endorse the instruction in *Phillips* as a correct statement of law since that issue was not before the Court, 151 Idaho at 107, 254 P.3d at 8, our interpretation of what the identical language means is instructive to its meaning in the case at hand.

fact. *Tiegs v. Robertson*, 149 Idaho 482, 485, 236 P.3d 474, 477 (Ct. App. 2010); *see also Hunter v. State, Dep't of Corrs., Div. of Prob. & Parole*, 138 Idaho 44, 46, 57 P.3d 755, 757 (2002) ("An order denying a motion for summary judgment is not an appealable order itself, nor is it reviewable on appeal from a final judgment."). Therefore, we do not address this argument.

### b. The district court did not err by denying the School's motions for directed verdict and JNOV.

At the close of the Hennefers' case at trial, and then again at the end of its case, the School moved for a directed verdict on the issue of recklessness. These motions were denied. The School argues the trial court erred in denying the motions because (1) the trial court applied a negligence standard instead of the correct recklessness standard, and (2) had the trial court applied the correct standard, the School would have been entitled to a directed verdict because there was insufficient evidence to support a claim of recklessness.

When reviewing a grant or denial of a motion for directed verdict, this Court applies the same standard as the trial court that originally heard the motion. *April Beguesse, Inc. v. Rammell*, 156 Idaho 500, 508–09, 328 P.3d 480, 488–89 (2014). We must determine

> whether there was sufficient evidence to justify submitting the claim to the jury, viewing as true all adverse evidence and drawing every legitimate inference in favor of the party opposing the motion for a directed verdict. This test does not require the evidence be uncontradicted, but only that it be of sufficient quantity and probative value that reasonable minds could conclude that a verdict in favor of the party against whom the motion is made is proper. Where a non-moving party produces sufficient evidence from which reasonable minds could find in its favor, a motion for directed verdict should be denied.

*Id.* at 509, 328 P.3d at 489. Therefore, to uphold the district court's denial of the motion, there must have been sufficiently quantitative and probative evidence that, viewing all evidence and inferences in favor of the Hennefers, reasonable minds could conclude that Mecham acted recklessly.

In addition to the motions for directed verdict, the School also appeals the denial of its motion for JNOV. Again arguing the purely subjective standard of recklessness, the School argues there was not sufficient evidence to support a jury determination that (1) Mecham actually perceived the danger in this case and continued his course of conduct, and (2) Mecham's course of conduct involved a high degree of probability that harm would actually result. When reviewing a grant or denial of a motion for JNOV, this Court applies the same standard as the trial court that originally heard the motion. *Id.* We must uphold a jury verdict

if there is evidence of sufficient quantity and probative value that reasonable minds could have reached a similar conclusion to that of the jury. In reviewing a grant or denial of a motion for JNOV the court may not reweigh evidence, consider witness credibility, or compare its factual findings with that of the jury. The court reviews the facts as if the moving party had admitted any adverse facts, drawing reasonable inferences in favor of the non-moving party.

*Id.*

In their case at trial, Hennefers brought forth significant evidence that Mecham acted recklessly, including: (1) the weather was snowy and foggy; (2) the roads were icy and slick; (3) visibility was poor; (4) the road was a 65 mph highway; (5) there were other cars in the vicinity; (6) Austin had only three hours driving experience on highways; (7) there were safer places to turn around; (8) Mecham had been taught that a three-point turn is the most hazardous type of turnabout; (9) Mecham did not use a route plan for the drive, which he had been taught to do; and (10) despite all this, Mecham instructed Austin to conduct the three-point turn at the location of the accident.

Viewing the evidence in favor of Hennefers, the weather the morning of the accident was foggy, and the roads were very slick. Jennifer Mares testified that when they began their student drive the day of the accident, the roads looked slick. She testified that Austin had to turn his high beams off because it was foggy and Austin "couldn't really see very well." Hugh Derham, the first to arrive at the scene of the accident, described the weather and road conditions as "cold, wet, icy." The second witness to arrive at the scene, Officer Ornelas, described the weather conditions as follows:

> I remember that the snow that was on the roadway, it was very slick, that nasty dry snow that gets packed down into the asphalt and it's pretty much like black ice. . . . And it was pretty much the whole way there, all the way up to what would later be the crash scene. It was the same way.

Officer Miller was called to the scene the morning of the accident. He said as he drove toward the accident the road conditions got worse turning "from wet to black ice to a measureable amount of ice on the roadway." He said, as he got closer to the scene,

> there was what I would call a measurable amount of ice on the roadway. You could really hear your tires on the—almost as if you were on a gravel road, you could sense that you were not traveling on smooth pavement anymore. You could see the frozen snow, frozen slush, ice, on the road. It wasn't what I would call black ice. You could definitely see that there was something on the roadway.

Although at trial there was testimony from Driver's Education instructors that having a student

drive in snowy conditions can be a good opportunity for practice, there was no testimony that a three-point turn would be appropriate under those conditions.

In addition to the fog and slick roads, the lighting conditions made visibility very poor, as the accident happened within a few minutes of civil twilight. Brian Johns, the person who trained Mecham on how to teach Driver's Education, testified that "the grey hours of twilight and dawn are the most dangerous times of the day" because "[v]isibility is reduced but, also, the eyes haven't had time to adjust to the change in light." He said that during twilight and dawn, headlights are more difficult to see because the lighting conditions outside are still slightly light, meaning there is less contrast between the headlights and the outdoor lighting conditions. This is in contrast to the situation where headlights are easier to see because it is pitch black out and there is more contrast between the outdoor lighting conditions and the brightness of the headlights. Jamie Maddux, the School's accident reconstructionist testified that the accident occurred right around the most dangerous time of day as far as visibility is concerned. Officer Ornelas said the lighting conditions required headlights to be used, but said that one still could not "make things out very clear in the distance." He said that "[t]he dark eats the headlights."

The evidence shows the accident happened on Highway 20, a 65 mph highway, and there had been other cars in the vicinity. Mares testified that during the drive there were other cars in the vicinity. Shortly before the accident, the Driver's Education vehicle came to the intersection with Highway 75. Mares testified they were stopped at that intersection for "a minute or two, maybe more," waiting for traffic to clear. She said "there were a few cars coming down that Shoshone Hill—you know like going towards Shoshone, and there was a few cars coming, like, from where we were going past west to Boise." There were also cars coming down off Timmerman Hill toward Bellevue. In addition to the cars at the intersection of Highways 75 and 20, Lopez-Rodriguez' vehicle was obviously in relatively close proximity to the Driver's Education vehicle, and Hugh Derham's vehicle was traveling closely enough behind Lopez-Rodriguez that Derham could see Lopez-Rodriguez' taillights and brake lights at the time of the crash. Officer Ornelas' commute to work brought him to the accident scene shortly after it occurred. Although Officer Ornelas testified he did not recall there being much traffic the morning of the accident, the accident happened during typical commute hours, and by the time Ornelas left the scene, roughly an hour after the accident, traffic was backed up a long distance in both directions.

The School attempts to present Austin as being an experienced driver due to his driving a motorcycle, four-wheeler, and/or small pickup in connection with work on his family's farm. However, the evidence shows that Austin had not driven on the highway other than in Driver's Education. Additionally, there is no evidence that he had ever performed three-point turns other than in Driver's Education. Austin had just over three total hours driving in Driver's Education.

Following the accident, Austin's father went to the area of the accident to determine whether there were other places to turn around that would have been safer than doing a three-point turn on Highway 20. He pointed out that there are several driveways visible from the location of the accident, and down the road a short distance there were several other locations that would have been safe to pull into and turn around. He specifically identified one driveway that is brightly lit and would be visible in the dark due to a large yard light. Even the School's expert Jamie Maddux agreed that "[t]here would have been safer maneuvers to perform on that morning in those conditions." He testified, "there were more suitable locations where the turn could have been made aided by the use of driveways or turnouts." And he agreed that there was a farmhouse shown in the crash photos and the driveway to that farmhouse would have been a safer place to turn around.

All evidence presented on three-point turns in general tends to show they are the most hazardous type of turnabout and should only be used in rare circumstances. Brian Johns testified that he teaches all Driver's Education instructors that three-point turns are hazardous to perform because the driver has to cross traffic lanes, the vehicle will be stopped across a traffic lane, and "executing this maneuver may put you in a high-risk situation." He teaches the instructors that "[a] three-point turnabout should rarely be used. Use this turnabout only when you are on a dead-end street or on a rural roadway with no driveways." He testified that he taught "the three-point turn is the most dangerous" of the types of turnabouts. Mecham testified that he was "taught that because a car doing a three-point turn crosses two traffic lanes for a long period of time, that's a high-risk maneuver to do."

Brian Johns also testified that Driver's Education instructors were required to use route plans for their drives. These route plans list where the instructor plans to go on the drive and what skills the instructor plans to have the students practice during the drive. Johns testified that teaching three-point turns is the kind of objective that would appear on a route plan. Although teaching three-point turns was part of the curriculum, Johns also testified that, had Mecham

10

submitted to Johns a route plan that included a "plan to practice three-point turns on Highway 20, which is a 65-mile-per-hour road, at twilight, on icy roads," Johns would not have approved that route plan. The evidence shows that Mecham did not use a route plan as he was taught to do. Mares testified that after the Driver's Education vehicle crossed the intersection of Highways 75 and 20 and had driven a way beyond it, "after a while Mr. Mecham said up ahead you're going to pull over and you're going to do a three-point turn and then we're going to switch drivers." Mares testified that it did not seem as though Mecham had altered his plans for the turnabout when he had Austin do the three-point turn. She said there was nothing to indicate the three-point turn was not Mecham's plan all along.

Given the facts above, we find there was sufficient evidence of recklessness to send the question to the jury. First, the evidence shows that Mecham made a conscious choice as to his course of conduct. Mares testified that Mecham told Austin to perform the three-point turn at the location where the accident occurred. Second, Mecham had knowledge of facts that would have caused a reasonable person to apprehend the risk under the circumstances in this case. It is clear that Mecham knew the weather conditions and road conditions, as they would be apparent to anyone in the vehicle. Mecham knew of the lighting conditions and should have known that such conditions make it more difficult to see other vehicles. He would have known that they were driving on a 65 mph highway and that they had seen several other cars that morning. He knew that conducting a three-point turn would cause their vehicle to block both lanes of traffic, that their vehicle would be stopped across both lanes, and that a three-point turn is the most hazardous turnabout to perform. He knew such a turnabout should only be used on dead-end streets or on rural roads with no driveways.

Further, Mecham knew of facts that would cause a reasonable person to apprehend the fact that the risk of harm was substantially greater in amount than the risk necessary to characterize one as negligent. Given the inherent hazardousness of the three-point turn and the inexperience of the student drivers, any of the aggravating circumstances individually (weather, road conditions, lighting conditions, etc.) would raise the question of whether Mecham was negligent in telling Austin to perform the maneuver. However, when all those circumstances are added together, the degree of risk and likelihood of the harm is significantly compounded. Considering the totality of the facts in evidence, the jury could reasonably have concluded that Mecham's conduct rose to a risk-creating level far exceeding that necessary for a finding of

11

negligence. Because there is sufficient evidence for reasonable minds to find that Mecham acted recklessly, the district court did not err in denying the School's motions for directed verdict and JNOV.

**B.    The district court did not err in instructing the jury.**

The School argues the district court erred in instructing the jury because (1) there was not sufficient evidence to support an instruction on recklessness, and the instruction on recklessness was an incorrect statement of the law, (2) the order of the special verdict questions over-emphasized the element of recklessness and influenced the jury award, and (3) the court's failure to give an instruction on a driver's duty to keep a proper lookout allowed the jury to unfairly place 100% of the fault on Mecham and none on either Austin or Lopez-Rodriguez.

We exercise free review over the propriety of jury instructions. *Mackay v. Four Rivers Packing Co.*, 151 Idaho 388, 391, 257 P.3d 755, 758 (2011). The standard for whether a particular instruction "should or should not have been given is whether there is evidence at trial to support the instruction, and whether the instruction is a correct statement of the law." *Id.* We must review the district court's "jury instructions as a whole to determine whether the instructions fairly and adequately present the issues and state the law." *Id.* Finally, the district court does not err in the use of a special verdict form unless the form incorrectly instructs the jury as to the law or the form was confusing. *Id.*

**1.    The district court did not err in its instruction on "recklessness."**

Jury instruction 20 provided the following definition of recklessness:

> The words "willful or reckless misconduct" when used in these instructions and when applied to the allegations in this case, mean more than ordinary negligence. The words mean intentional or reckless actions, taken under circumstances where the actor knew or should have known that the actions not only created an unreasonable risk of harm to another, but involved a high degree of probability that such harm would actually result.

This instruction is nearly identical to IDJI 2.25, which we approved in Part III.A.1 as the appropriate standard for Idaho Code section 6-1603. Jury instruction 20 is a correct statement of the law in this case and there was substantial evidence to show Mecham acted recklessly.

**2.    The district court did not err in refusing to re-order the questions on the special verdict form.**

Question five on the special verdict form asked the jury to determine whether Mecham acted recklessly. Question six then asked the jury to calculate damages sustained by each

plaintiff. The School argues that placing the question of recklessness immediately preceding the question of damages over-emphasized the element of recklessness and influenced the jury award. To establish error with a special verdict form, one must show either that the form incorrectly instructed the jury on the law or the form was confusing to the jury. *Le'Gall v. Lewis Cnty.*, 129 Idaho 182, 186, 923 P.2d 427, 431 (1996).

The School does not provide any authority or argument to show the special verdict form contained a misstatement of the law, nor does the School provide any authority or argument tending to show that the jury in this case was somehow confused by the special verdict form. The School simply argues that the placement of the recklessness question immediately before the damages question would cause the jury to have reckless conduct on its mind as it calculated damages, potentially resulting in a higher damage award. However, the jury was otherwise instructed on what it was permitted to consider in calculating damages. There is no evidence the order of the questions on the special verdict form somehow confused the jury into thinking it could deviate from the standards for damages laid out in the jury instructions. There is nothing to suggest the jury incorrectly thought it could consider the severity of Mecham's conduct in calculating damages. The School believes the damages to be too high but points to nothing that suggests the amount of damages was actually affected by the order of the questions. Therefore, the School has not shown the district court erred in including the recklessness question before the damages question on the special verdict form.

### 3. The district court did not err in refusing to include an instruction on a driver's responsibility to maintain a proper lookout.

The School argues it was critical to its case that Austin and Lopez-Rodriguez were not keeping a proper lookout as drivers, and the district court erred in failing to allow an instruction explaining that every driver has a duty to keep a proper lookout.[5] The Hennefers counter that such an instruction, applying only to *drivers*, is misleading and would have been prejudicial to their case because testimony at trial indicated that Mecham had a duty to keep a proper lookout

---

[5] The School's requested and rejected instruction provides:

> The law requires that all drivers keep a proper lookout. Vehicle operators are required to keep their vehicles under control at all times, considering actual and potential hazards. It is not only the duty of the operator to look, but it is his duty to see and be cognizant of that which is plainly visible or obviously apparent, and a failure on his part in this regard, without proper justification or reason, makes him chargeable for a failure to see what he should have seen had he been in the exercise of reasonable care.

(Citing *Vaughn v. Porter*, 140 Idaho 470, 473, 95 P.3d 88, 91 (Ct. App. 2004)).

while driving with students and, by mentioning only "drivers," this instruction suggests that Mecham did not have such a duty. The district court decided that the drivers' duty to keep a proper lookout was adequately covered by the other jury instructions and the testimony that had been given at trial. The question then becomes whether the jury was fairly and adequately instructed on a driver's duties of care, considering the instructions as a whole.

A requested instruction need not be given if it is adequately covered by other instructions. *Craig Johnson Constr. v. Floyd Town Architects*, 142 Idaho 797, 800, 134 P.3d 648, 651 (2006). Repetitious instructions are improper if the effect is to give undue emphasis to a particular theory. *Watson v. Navistar Intern. Transp. Corp.*, 121 Idaho 643, 667, 827 P.2d 656, 680 (1992). "In all but the most intricate negligence cases, the general definition of negligence sufficiently outlines the required standard of care." *McPheters v. Peterson*, 108 Idaho 107, 108, 697 P.2d 447, 448 (1985) In *McPheters*, parents brought a tort action against a driver who hit their five-year-old child with his car. *Id.* at 107, 697 P.2d at 447. The district court denied the parents' requested jury instructions explaining the standard of care required of the operator of an automobile more particularly than the standard definition of negligence. *Id.* at 107–08, 697 P.2d 447–48. Even though the requested instructions were correct statements of the law taken from Idaho Supreme Court opinions, the district court stated that in the circumstances of that case, the instructions were "unnecessary, as the approved [Idaho pattern jury] instructions adequately set forth the standard of care" in a negligence case. *Id.* at 108, 697 P.2d at 448. This Court upheld the trial court's decision to use only the general negligence instructions from the Idaho pattern jury instructions, finding that the record did not show the "case was so intricate as to require additional instructions amplifying on this general standard of care." *Id.*

Jury instruction 9 said "[i]t was the duty of Jeffrey Mecham, Sergio Lopez-Rodriguez, and Austin Hennefer, before and at the time of the occurrence, to use ordinary care for the safety of themselves and each other." Instruction 10 provided the definition of "negligence" and "ordinary care," showing that both drivers and Mecham must have acted with "the care a reasonably careful person would use under circumstances similar to those shown by the evidence." Instruction 15 stated that

> [a]ll drivers, including a minor operating a motor vehicle on a public highway, are charged with the same standard of conduct as an adult. A person learning to operate a motor vehicle under the tutelage of another is liable for injuries resulting from his own negligence in the operation of such vehicle.

Instruction 16 provided that a driving instructor assumes a duty to act with due care in his/her instruction, and that failure to act as an ordinarily reasonable driving instructor would constitute negligence. Instruction 18 applied expressly to drivers, providing that the drivers cannot turn a vehicle around unless they can do so "in safety and without interfering with other traffic." Instruction 19 expressly applied to drivers and provided that a vehicle cannot be driven at a speed greater than reasonable and prudent under the conditions, and having regard to actual and potential hazards, including inclement weather.

Taken as a whole, these instructions fairly and adequately cover a driver's duties of care and an additional instruction on a driver's duties would have been unnecessarily repetitive and placed undue emphasis on the drivers' duties over Mecham's duties. Under instructions 9 and 10 the jury could take everything into account that it believed should be done by a reasonably prudent driver and instructor. This would include keeping a lookout. Although the School argues the jury may have thought it could not find Austin at fault because he was only doing as he was instructed when he performed the turnabout, instruction 15 specifically shows that Austin was not absolved from responsibility for any negligent acts on his part purely by reason of being a minor or a driving student. Instructions 16 and 18 show that both Mecham and Austin were responsible for the safe execution of the turnabout because Mecham must have instructed Austin prudently and Austin must have executed the turnabout safely. Finally, instruction 19 would cover Lopez-Rodriguez' duty to keep a lookout under the circumstances because it provides that one is negligent if he/she does not have regard for the potential hazards on the road and must drive at a prudent speed considering those potential hazards. Given that the instructions clearly apply duties of care to Austin and Lopez-Rodriguez that would include keeping a lookout, the lookout duty is adequately covered by other instructions and an additional instruction on the matter would be unnecessarily repetitious. Mecham also had a duty to keep a proper lookout and, as the Hennefers point out, a specific lookout instruction would be misleading to the jury in that it would suggest only the drivers and not Mecham had such a duty. Even though the School's proffered instruction may have been a correct statement of law, this case is not so intricate as to require the court to expand upon the duties contained in the other instructions.

## C. The district court did not err in refusing to grant the School's motion for a new trial.

### 1. The School was not entitled to a new trial based on the amount of the verdict.

The jury returned a verdict of $1.5 million non-economic damages for Mr. Hennefer and

$2 million non-economic damages for Ms. Hennefer. Following trial, the School moved the district court to grant a new trial under Idaho Rule of Civil Procedure 59(a)(5). The district court denied this motion. The School argues the amount of the verdict entitles the School to a new trial because (1) the district court refused to weigh the evidence and decide what award it would have given as compared to the award given by the jury; (2) the amount of the award was the product of passion or prejudice; and (3) the amount of the award was punitive in nature.

The main thrust of the School's argument is that the Hennefers' attorney sought to inflame the jury during his closing statement by misstating and misrepresenting the facts and law and that the district judge did not act as an appropriate check on the excessive amount of the consequent award by properly comparing it with what he would have awarded. The School complains, for instance, that counsel told the jury Austin only had three hours of driving experience, whereas Austin had driven a motorcycle, a four-wheeler, and other vehicles around the farm for at least two years prior to the accident. Counsel for the Hennefers was likely referring to the 3.33 hours Austin had logged in driving on highways with an instructor. Riding a motorcycle or four-wheeler around the farm is not quite comparable to driving on a state highway. That may be why the Legislature requires a license for one of the activities but not the other. It is hard to find a misrepresentation and, if there was one, counsel for the School could certainly have either objected to the argument or pointed out the distinction in his own closing argument.

The School claims that Hennefers' counsel introduced new evidence by telling the jury he came up with the amount of damages he was asking for on behalf of the Hennefers based on studies done by the government. When the School's counsel objected on the basis of there being "no evidence of this type of thing," the district judge said: "There's not. You're arguing something that's not in evidence." The jury could properly have concluded that the district court was correct—that there was no evidence of such studies.

The School argues that, "most significantly," the Hennefers' counsel told the jury "the inclusion of a jury instruction on recklessness was a comment on the evidence by the judge." Counsel argued, "[w]e contend the School District was reckless because it was, and the Judge has instructed you on recklessness because he thinks the facts support it." One might interpret this as the School does—a remark tending to show that the judge was siding with the Hennefers on the issue of recklessness—but it could also be construed as meaning the judge had decided to

16

give an instruction on recklessness merely because he determined that there was sufficient evidence to allow the recklessness question to go to the jury. In any event, the School made no objection to the comment at the time and therefore did not preserve the issue for appeal. Furthermore, in jury instruction 1, the judge instructed the jury, "[w]hile the arguments and remarks of attorneys may help you understand and apply the instructions, what they say is not evidence. If an attorney's argument or remark has no basis in the evidence, you should disregard it." There is no evidence that the jury failed to follow this instruction.

A new trial may be granted if there has been an award of "[e]xcessive damages, . . . appearing to have been given under the influence of passion or prejudice." I.R.C.P. 59(a)(5); *April Beguesse, Inc.*, 156 Idaho at 513, 328 P.3d at 493. In deciding whether a jury award was excessive, the district court must weigh the evidence, determine the award it would have granted under the circumstances, and compare its award to the amount awarded by the jury. *Id.* If there is such a disparity between the amounts that the jury award appears to have been awarded under the influence of passion or prejudice, the award should not be upheld. *Id.* The trial court has broad discretion in making this determination and may draw upon its experiences with previous cases to reach its determination of an appropriate award. *Quick v. Crane*, 111 Idaho 759, 766, 769, 727 P.2d 1187, 1194, 1197 (1986). Appellate review of the trial court's discretionary decision asks

> (1) whether the district court correctly perceived the issue as one of discretion; (2) whether the district court acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) whether the district court reached its decision by an exercise of reason.

*Hughes v. State, Idaho Dep't of Law Enforcement*, 129 Idaho 558, 561, 929 P.2d 120, 123 (1996).

In deciding whether the jury award was so excessive as to merit a new trial, the district court noted its experience with Blaine County juries determining damages in personal injury cases since 1992. Noting a juror's comment during jury selection, the court remarked that the whole question of damages was, "[w]hat's a human life worth. I think the plaintiff proved its case and the jury gave their opinion of what a human life is worth—or what this human life was worth." The court suggested that every case is different and every jury is different. It would be unlikely for two different juries to come up with identical awards under a particular personal injury case. Again noting its task to compare the award it would have given with the award the

17

jury gave, the court stated, "I cannot say the [jury] verdict shocks the conscience."[6]

The court's ruling on the issue of excessive damages culminated in the following language:

> The Court's role is to search the record, view credibility, determine whether there is evidence or an inference of passion or prejudice or something wrong with the verdict before the Court acts. The plaintiff has pointed to multiple verdicts that run from $250,000 to $9 million. I want to point out that the verdict here was unanimous. I would say that any person who could stand here and say that the jury got it wrong in this case did not listen to the evidence. I agree with Mr. Hepworth that the relationship of the parents to the child was very close. I think the jury measured that. I cannot say that the disparity between the jury's award and what the Court would have awarded was so great as to suggest the award was what might have been expected of a jury acting under the influence of passion or prejudice. If I had been on that jury, I cannot say my verdict would have been any different. . . . In measuring this [award] under the standards the law provides, is this a result of passion or prejudice? I cannot say that. I think the jury valued a human life.

Although the court also expressed its distaste for having the task of second-guessing the jury award, it is evident the court drew upon its experience in past cases to determine an appropriate award based on the evidence in this case. It specifically stated one of the factors it considered was the relationship Austin had with his parents. By saying that one who claims the jury got the award wrong must not have listened to the evidence, the court implies that one who did hear the evidence, including the court, would agree with the jury's award. The judge suggested that, had he been on the jury instead of acting as the judge, he would have agreed to the award the jury gave. Though the court did not expressly state a dollar amount it would have awarded, the court's analysis shows it went through the necessary steps of weighing the evidence, comparing what it would have awarded to the amount the jury actually awarded, and determining there was not a disparity between those amounts sufficient to warrant a new trial. Therefore, the court acted within the bounds of its discretion and consistently with the applicable legal principles.

Additionally, by explaining the applicable standard, going through an analysis of the steps in that standard, and concluding a new trial was not appropriate, the district court showed it reached its determination by an exercise of reason. Therefore, we hold that the district court did not abuse its discretion in deciding a new trial was not warranted by virtue of the amount of the

---

[6] "Shocking the conscience" is one articulation of how disparate the jury's award and the court's hypothetical award must be before the court should grant a new trial based on excessive damages. *Quick*, 111 Idaho at 769–70, 727 P.2d at 1197–98.

award.

> **2. The School was not entitled to a new trial by reason of insufficient evidence or an error in law occurring at trial.**

In addition to seeking a new trial based on the claim of an excessive verdict, the School also moved for a new trial under Idaho Rules of Civil Procedure 59(a)(6) & (7). Under these sections, the trial court may grant a new trial if the evidence is insufficient to justify the verdict, or there was an error in law that occurred at trial. I.R.C.P. 59(a)(6) & (7). The School argues the error in law was the standard for recklessness applied by the court. It argues that the court ignored the elements of knowledge and foreseeability. As discussed above, the court applied the appropriate standard for recklessness in the context of Idaho Code section 6-1603 so there was no error of law as the School argues.

As to the question of sufficiency of the evidence, the School's arguments are without merit. In its briefing and argument on its Rule 59(a)(6) motion, the School's primary argument to the trial court was that the evidence presented at trial could not justify the jury's verdict that Lopez-Rodriguez was not negligent with respect to the accident. The School appears to have abandoned this theory on appeal since its appellate briefs do not mention Lopez-Rodriguez' alleged negligence in the Rule 59(a)(6) arguments. The arguments the School does make under Rule 59(a)(6) are all premised on the School's position that the district court should have applied a purely subjective recklessness standard requiring proof that Mecham had actual knowledge of Lopez-Rodriguez' approaching vehicle, actually apprehended the risk associated with that vehicle, and instructed Austin to make the turnabout anyway. Because this is the incorrect standard, the School's argument fails.

## D. The district court did not err by allowing Joellen Gill to testify.

The School argues it was error to allow the testimony of Joellen Gill at trial because (1) the Hennefers called Gill as a rebuttal witness, but her testimony was not actually rebuttal to anything; (2) Lopez-Rodriguez was available to testify at trial as to what he saw, rather than having Gill testify as to what Lopez-Rodriguez saw; (3) Gill's testimony speculated as to others' states of mind; (4) Gill did not testify to anything the jurors could not have concluded on their own; and (5) her testimony invaded the province of the court by attempting to show Austin had no legal duty of care.

In response to the School's first argument, the Hennefers argue they called Gill to rebut the School's arguments that Lopez-Rodriguez should have seen the Driver's Education vehicle

with plenty of time to stop and that Austin was negligent in making the turnabout in front of Lopez-Rodriguez. "Rebuttal evidence is evidence which explains, repels, counteracts, or disproves evidence which has been introduced by or on behalf of the adverse party. The mere fact that testimony might well have been presented during [a party's] case in chief does not, by itself, make it inadmissible for rebuttal." *State v. Moses*, 156 Idaho 855, 867, 332 P.3d 767, 779 (2014) (internal quotation marks and citations omitted).

The School retained accident reconstructionist Jamie Maddux to testify about the circumstances surrounding the accident. Maddux made the following representations in his testimony: he "reached the conclusion that [Lopez-Rodriguez] had plenty of time to have been able to have seen what was going on up the road ahead of him, and he had enough time that he could have slowed down and come to a stop long before the collision ever occurred"; "the actions of Mr. Lopez, the excessive speed and the failure to notice the Buick from a reasonable distance, was the primary contributing factor to the crash"; "there is a very good likelihood that had [Lopez-Rodriguez] stayed in the westbound lane, the collision would not have occurred." This testimony by Maddux was offered for the purpose of establishing that Lopez-Rodriguez' negligence caused the accident. The Hennefers called Gill, a human factors expert,[7] to rebut this testimony. Gill testified as to experiments she performed under lighting conditions similar to those at the time of the accident in order to determine what each person involved was capable of seeing under the circumstances of this accident. She also explained from a human factors perspective how, in her opinion, Lopez-Rodriguez may have interpreted what he was seeing when he first saw the marker lights on the Driver's Education vehicle. Maddux' testimony was offered by the School to show Lopez-Rodriguez was driving in an unreasonable way, given the conditions, and that he did not act reasonably when he first saw the marker lights. Gill's testimony on the matter was in direct rebuttal to the School's argument and was an attempt to show Lopez-Rodriguez did act reasonably based on how he perceived what he saw.

Additionally, throughout litigation in this case, the School maintained that Austin acted

---

[7] Ms. Gill is employed by Applied Cognitive Sciences, a human factors engineering consulting firm. Her firm does theoretical research in the area of human factors, sets up safety programs, and does forensic work like that in this case "where there is a need for someone to evaluate the circumstances from a human factors and safety perspective." Gill described "human factors engineering" as:

> the combination of two seemingly very different sciences; that would be the science of design engineering on one hand and the science of cognitive psychology on the other hand. In other words, it's a discipline that takes into account how people think, how people interact with their environment, how people process and perceive information. . . .

negligently in performing the three-point turnabout. Despite the School's concession that Austin performed the turnabout at Mecham's instruction, the School contends Austin should have known better than to do so. The Hennefers argued that Austin was not negligent because he simply did as he was instructed to do. The Hennefers called Gill to testify that even if Austin did know better than to do a three-point turn under the circumstances, Austin may not have acted unreasonably from a psychological perspective by failing to question Mecham's authority. Because Gill's testimony on this issue was offered to explain Austin's actions and disprove Austin's negligence, it is proper rebuttal evidence.

The School secondly argues it was inappropriate for Gill to testify to what Lopez-Rodriguez saw as he approached the Driver's Education vehicle because Lopez-Rodriguez was available to testify as to what he saw or thought he saw. However, the Hennefers did not use Gill to introduce any evidence as to what Lopez-Rodriguez saw. Lopez-Rodriguez' statement as to what he thought he saw as he approached the Driver's Education vehicle was already in evidence. Gill was merely asked to explain her opinion as to how Lopez-Rodriguez' statement that he saw the Driver's Education vehicle parked to the side of the road just before impact conforms to what the rest of the testimony shows—that the Driver's Education vehicle was actually positioned across both lanes in the process of a three-point turn. Lopez-Rodriguez was likely not qualified from a psychological, human-factors perspective to explain how his perception of the Driver's Education vehicle fit with the rest of the evidence.

Lopez-Rodriguez' statement as to what occurred to cause the accident was admitted through Officer Ornelas, who spoke with Lopez-Rodriguez at the scene of the accident.[8] Lopez-Rodriguez' account of the accident was as follows:

> He said after he had got on 20 and he was traveling, he said he noticed a vehicle off the side of the road up ahead of him. Mr. Lopez told me that he—as he got closer, he slowed down, and as he got really close up to the vehicle, he moved over . . . to his left, towards the center of the road. I remember Mr. Lopez was shaking his head. He goes, I don't know why they did it, but the car turned in front of me. Mr. Lopez told me that he tried to stop. But he was not able to stop his car, and he hit the car when it was right in the middle of the road.

Given Maddux' testimony that Lopez-Rodriguez would have been able to see the other vehicle and had time to stop, Gill's testimony was necessary to explain from a psychological, human-

---

[8] Lopez-Rodriguez' statement was admitted through Ornelas under Idaho Rule of Evidence 803(2) concerning excited utterances and the district court's ruling on that matter has not been appealed.

factors perspective why it was reasonable for one to interpret the scene as Lopez-Rodriguez had. Because Lopez-Rodriguez was not qualified to give testimony from this human-factors perspective, Lopez-Rodriguez' availability is immaterial as to whether Gill's testimony on the matter was admissible.

Thirdly, the School argues Gill's testimony included speculation as to Lopez-Rodriguez' and Austin's states of mind, and there was no evidence to suggest she knew what Lopez-Rodriguez or Austin was thinking. This argument is unpersuasive. Contrary to the School's argument, Gill did not testify to Lopez-Rodriguez' state of mind. The statement of what Lopez-Rodriguez thought he saw as he approached the other vehicle was already in evidence. Lopez-Rodriguez, himself, explained his state of mind to Ornelas at the scene of the accident. From Lopez-Rodriguez' perspective, the Driver's Education vehicle was parked to the side of the road and then turned out in front of him at the last second. Gill's testimony was simply used to explain, based on scientific evidence about typical driver behavior, driver expectation, and driver visual gaze, why Lopez-Rodriguez' state of mind was reasonable, given what he thought he had seen. It was Lopez-Rodriguez—not Gill—who stated what Lopez-Rodriguez thought he had seen. Therefore, Gill was not speculating as to Lopez-Rodriguez' state of mind.

Additionally, Gill did not speculate as to Austin's state of mind. She explained general psychological studies about transference of authority and stated "even if [Austin] believed and knew that a three-point turn in this location was something that he shouldn't do because it was hazardous," he was not likely to protest Mecham's instruction. (Emphasis added). She did not speculate and opine that Austin did in fact think it was dangerous to perform a three-point turn under the circumstances. She simply explained that if the jury thought Austin knew the maneuver was unsafe, he would not necessarily be unreasonable in performing the maneuver anyway.

Fourth, the School argues Gill testified unnecessarily to conclusions the jury was qualified to make based on its experience and knowledge. A witness "qualified as an expert by knowledge, skill, experience, training, or education" may testify to his or her opinion regarding a fact in issue "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence." I.R.E. 702. The purpose of allowing an expert witness to testify is to "provide testimony on subjects that are beyond the common sense, experience and education of the average juror. Where the normal experience and qualifications of lay jurors permit them to

draw proper conclusions from given facts and circumstances, then expert conclusions or opinions are inadmissible." *Rockefeller v. Grabow*, 136 Idaho 637, 647, 39 P.3d 577, 587 (2001) (internal citations omitted). The layout and circumstances surrounding an accident scene are often complicated. This is especially true here where Lopez-Rodriguez, as one of only two people with a memory of the accident, testified to perceiving the circumstances significantly differently than Mares and the accident reconstructionists. It is likely the typical juror could not have reconciled why Lopez-Rodriguez' account of the accident varied from the others. This may have caused the jury to question whether Lopez-Rodriguez was simply trying to avoid liability by stating that the Driver's Education vehicle pulled in front of him at the last second. Gill's testimony was necessary to explain from a scientific perspective that Lopez-Rodriguez was reasonable in how he interpreted what he saw. It is unlikely the jury would have been able to reach that conclusion on its own.

It is likewise unlikely that the jury would have had an explanation for why Austin may have been reasonable in performing a three-point turn under circumstances he may have known were unsafe. Gill holds qualifications in human-factors analysis and spends a significant amount of time analyzing human behavior. While the jury could have discussed what each of the jurors may have done under similar circumstances, without Gill's testimony, the jury would likely not have known the extent to which people are typically willing to transfer decision-making authority to authority figures. The jury may not have been able to conclude such a transference of authority is reasonable.

Lastly, the School argues Gill's testimony was an attempt to show Austin had no duty of care, which invaded the province of the court. This argument is also unpersuasive. Gill's testimony contained no mention of Austin's duty to act reasonably or to operate his vehicle in a reasonable manner. Her testimony simply attempted to show that the way Austin acted under the circumstances was reasonable, and that therefore, he did not breach his duty. Additionally, the jury was given specific instructions showing Austin did have a duty to act reasonably for the safety of himself and others. Therefore, even if Gill's testimony could have been interpreted as an attempt to show Austin did not have a duty, given the prevalence of the instructions showing Austin did have a duty, any error in allowing Gill's testimony in this respect is harmless.

**E.      The district court did not err in denying the Hennefers' claim for attorney fees.**

During pre-trial discovery, the Hennefers requested that the School admit (1) Austin was

not negligent with respect to the accident, and (2) Mecham was negligent in his conduct with respect to the accident. The School refused to admit either proposition. Following trial, the Hennefers moved for costs and fees pursuant to Idaho Rule of Civil Procedure 37(c) for the School's failure to admit these propositions. Rule 37(c) states in relevant part:

> **(c) Expenses on Failure to Admit.** If a party fails to admit . . . the truth of any matter as requested under Rule 36, and if the party requesting the admissions thereafter proves . . . the truth of the matter, the requesting party may apply to the court for an order requiring the other party to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees. The court shall make the order unless it finds that . . . (3) the party failing to admit had reasonable ground to believe that the party might prevail on the matter, or (4) there was other good reason for the failure to admit.

I.R.C.P. 37(c). In opposition to this motion, the School argued that Idaho Code section 6-918A precludes the award of attorney fees absent a showing by clear and convincing evidence that the School "was guilty of bad faith in the . . . defense of the action."[9] I.C. § 6-918A. Additionally, the School argues that its denial of the Hennefers' requested admissions falls within one of the exceptions in Rule 37(c), meaning attorney fees are not appropriate. The trial court agreed with the School on both of these arguments.

We hold that sanctions are not warranted for the School's failure to make the requested admissions. Despite the phrase in Rule 37(c) stating that "the court *shall* make the order unless . . . ," the "decision to award fees under this section is discretionary and is accordingly reviewed under the abuse-of-discretion standard." I.R.C.P. 37(c) (emphasis added); *Schwan's Sales Enters. v. Idaho Transp. Dep't*, 142 Idaho 826, 835, 136 P.3d 297, 306 (2006). The determination of whether an exception applies is also within the discretion of the trial court. *Contreras v. Rubley*, 142 Idaho 573, 577, 130 P.3d 1111, 1115 (2006).

In deciding not to award attorney fees under Rule 37(c), the district court stated that one of the exceptions in that section applied because the School had reasonable grounds to think it would prevail on the matter. The court stated that, although the jury did not agree, the School was reasonable in believing it could have proven Austin and/or Lopez-Rodriguez were negligent and partially responsible for the accident. The Hennefers cite three cases, arguing each has upheld the trial court's award of attorney fees under Rule 37(c). However, only one of these cases, *Contreras*, is a decision of this Court and it is easily distinguishable.

---

[9] We need not decide whether attorney fees would be appropriate under the bad faith standard of Idaho Code section 6-918A because the Hennefers specifically stated they were not claiming fees under that section at the trial level.

24

First, in *Contreras* we upheld the trial court's discretionary decision to award attorney fees under Rule 37(c), while here the Hennefers ask the Court to reverse the trial court's discretionary decision to deny attorney fees. *See id.* Second, the facts in *Contreras* as to the defendant's negligence were more compelling there than they are in the case at hand. There, after being involved in a car accident, defendant was cited for driving too fast for the conditions and the responding police officer concluded in his report that defendant's driving was a contributing circumstance to the resulting accident. *Id.* at 577–78, 130 P.3d at 1115–16. These facts tend to show that the *Contreras* defendant was at least partially negligent in causing the accident. Conversely, Mecham was not issued any kind of citation, charged with any crime, nor was it alleged that he violated a statute. The facts of the case at hand are not so closely analogous to *Contreras* to convince this Court that the district court abused its discretion in deciding the School acted reasonably in denying the requested admissions.

In deciding whether attorney fees were appropriate under Rule 37(c), the trial court analyzed the language of that section and found that one of the exceptions applied. The Hennefers have not made any convincing arguments that the trial court acted outside the bounds of its discretion or failed to reach its conclusion by an exercise of reason. Therefore, we uphold the trial court's decision declining to award attorney fees under Rule 37(c).

**F.      The Hennefers are not entitled to attorney fees on appeal.**

The Hennefers argue they are entitled to attorney fees on appeal under Idaho Code section 6-918A because the School essentially asked the Court to second-guess the jury's findings of fact and used the appeal as a delay tactic. Idaho Code section 6-918A provides in relevant part that:

> reasonable attorney fees may be awarded to the claimant, . . . as costs, in actions under this act, upon petition therefor and a showing, by clear and convincing evidence, that the party against whom or which such award is sought was guilty of bad faith in the . . . defense of the action.

There are not facts in this case that amount to a showing of bad faith on the School's part. While the School does ask the Court to re-examine the facts considered by the jury, the main focus of the School's argument is that those facts were examined below using an incorrect legal standard. Idaho law employs different legal standards for "recklessness" in a number of different contexts, and the School used a line of Idaho case law to reasonably argue the incorrect standard was used. Additionally, if the Court decided the School had argued the correct legal standard for

recklessness, it would be necessary to re-examine the facts under that standard. Therefore, the School was not acting in bad faith in arguing that the facts needed to be re-examined under its proposed standard.

The Hennefers admitted below that the School did not defend the cause of action against it frivolously when it stated, "I'm not claiming that their defense was frivolous. . . . I've never alleged that the defense was frivolous." As is the case on appeal, much of the School's argument below centered around its claim that Idaho law supported a different standard for recklessness than the district court applied. If those arguments were not frivolous before the district court, it would likewise not be frivolous to make the argument to this Court that the district court erred on those matters. Because the Hennefers have not shown that the School maintained its defense in bad faith, attorney fees under Idaho Code section 6-918A are not appropriate.

## IV.
## CONCLUSION

We affirm the judgment and post-trial orders of the district court. Costs to the Hennefers.


Chief Justice BURDICK, and Justices EISMANN and HORTON CONCUR.


Justice W. JONES dissents without opinion.